Agnes P. Hight CHISUM, Plaintiff and Appellant,

v.

Harry BEHRENS, Jon Behrens, and Behrens Mortuary, Inc., Defendants and Respondents.

No. 12502.

Supreme Court of South Dakota.

Sept. 5, 1979.

Charles Rick Johnson of Johnson, Johnson & Eklund, Gregory, for plaintiff and appellant.

Lawrence L. Piersol of Davenport, Evans, Hurwitz & Smith, Sioux Falls, with Michael L. Luce, Sioux Falls, on the brief, for defendants and respondents.

BERNDT, Circuit Judge.

Plaintiff, Agnes P. Hight Chisum, initiated this action to seek actual damages for mental anguish and physical illness, together with exemplary damages, following her husband's untimely death. She alleged violation of her right to immediate possession of the body of her husband by defendants, Harry Behrens, Jon Behrens and Behrens Mortuary, Inc., and further, that defendants without her consent had made dissections and incisions into the body for the purpose of embalming.

The original complaint alleged that defendants acted recklessly and unlawfully. The trial court granted defendants summary judgment as to exemplary damages. The trial court also required plaintiff to amend her complaint to allege that defendants acted intentionally or wantonly.

This is an appeal by plaintiff from a judgment entered by the trial court on a jury verdict in favor of defendants. We affirm.

The decedent, Robert Hight, on Thursday, July 10, 1975, worked his regular civil service job as a painter at the air base outside of Rapid City, South Dakota. He then went home, ate dinner, and departed home about 6:00 P.M. to do some painting on a private residence in Rapid City. At about 6:50 P.M., Charles A. Counsellor, who was on duty for the local ambulance service, received a phone call regarding the collapse and possible death of Mr. Hight at the residence he was painting. Mr. Counsellor and another ambulance attendant arrived at the scene between five and ten minutes later. Mr. Counsellor is a state-certified emergency medical technician and certified as a cardio-pulmonary resuscitation instructor. He examined Mr. Hight and found no vital signs. There was no pulse, and no respiration. The eyes were glazed, dilated, fixed and had no vitreous pressure. There was presence of cyanosis in the face and left arm, and some "pooling" along the left arm and back of the neck, which is a settling of the blood to the lowest level of the body, caused by lack of circulation. Mr. Counsellor concluded on the basis of his examination and observations that Mr. Hight was dead and that resuscitative measures would be of no avail.

Subsequent to the arrival of the ambulance attendants, Rapid City Police Officer Tom Schreiner arrived at the scene, closely followed by Rapid City Police Officer Don-

ald Hemstock. Officer Hemstock was the supervisor of that shift and took pictures. Officer Schreiner had four and one-half years of experience as an Air Force Medic. He had twenty-two hours training as an emergency medical technician, together with various First Aid classes, Red Cross First Aid classes, and seminars. He was trained in cardio-pulmonary resuscitation. Officer Schreiner also examined Mr. Hight for vital signs, found none, and concluded that he was dead.

Deputy Sheriff Gary Buffington received a call at about 6:50 P.M. regarding a possible death, and arrived about 7:10 P.M. Officers Schreiner and Hemstock were already at the scene. Deputy Pennington County Coroner, Curtis Rostad, received a call at about 7:00 P.M., and arrived shortly after Buffington. Rostad made an independent examination of the body and found the same lack of vital body signs. The local hospital had no facilities to keep bodies, and there is no city or county morgue. The procedure is to send bodies to one of the local mortuaries. Knowing that Behrens Mortuary had conducted the funeral of Mr. Hight's mother a few months earlier, and being an employee at Behrens Mortuary, Rostad directed that the ambulance take the body there. Deputy Buffington volunteered to drive out to the Hight residence and break the news to plaintiff herein, as he was personally acquainted with her. He was to talk to plaintiff, and then call Behrens Mortuary and advise them where the body was to be taken, or if it was to remain there.

When the body arrived at Behrens Mortuary at approximately 8:00 P.M., Jon Behrens and an assistant did the unpleasant preliminary cleaning; then waited for instructions from Deputy Buffington prior to beginning the embalming procedure.

Deputy Buffington arrived at the Hight home, where plaintiff was understandably upset to learn of her husband's sudden death. According to his testimony, he told her that Mr. Hight had been taken to Behrens Mortuary, that they could handle the funeral arrangements if she wished or, "if she wanted somebody else to handle them, we could make those arrangements." She responded, " 'No, that's okay,' or something to [that] effect and I believe at this time, that she had mentioned also that something to the effect that they handled Bob's mother's funeral . . . ." Deputy Buffington helped place some calls to relatives, and plaintiff arranged for a babysitter. She then asked to go see her husband and, at that time, Deputy Buffington called Jon Behrens at the mortuary, who asked, "Where did they want the body taken or is it to be remaining with us." Behrens was advised it was to remain with them, and that Mrs. Hight had requested to see her husband. Behrens told Buffington that the body was not embalmed yet, and that it would be advisable if she were to wait about a half an hour until that procedure was completed, so that the body would be more viewable. He asked Buffington if he would talk to Mrs. Hight about that and if there was any problem, to call back. Buffington conveyed the message to plaintiff and, five or ten minutes later, called Jon Behrens again and told him that she was persistent about wanting to come down. Behrens said "Okay," but indicated that he had started the embalming process. Buffington wished to spare plaintiff the unpleasantness of viewing the body until it was presentable, so he told her it would be a few minutes. He thinks they may have made a few more phone calls, then started for the mortuary after the babysitter arrived.

The embalming process required that incisions be made in the body. Jon Behrens completed the embalming at about 9:00 P.M., then closed the mortuary and went to his home about three blocks away. Buffington and plaintiff arrived at the mortuary about 9:30 and were greeted by Harry Behrens, who lived in the same building. Jon Behrens arrived a few minutes later. The body was shown to plaintiff a few minutes after her arrival. Plaintiff stayed briefly, and there was little conversation. Plaintiff was asked if a minister should be notified and replied in the negative.

On Friday morning, July 11, plaintiff met with Harry Behrens, selected a casket, and made arrangements for the funeral. Also on Friday, Deputy Coroner Rostad contacted Dr. Normal Gray, a physician who had recently treated Mr. Hight. It is a coroner's duty to obtain any pertinent information helpful to completing an accurate death certificate. From his discussion with Dr. Gray, he learned of decedent's history of angina/pectoris and that he had complained of chest pains. Mr. Rostad filled out the death certificate to indicate that death was caused by "acute myocardial infarction" and that Mr. Hight had a "history of angina/pectoris." He also noted that death was "instantaneous," which meant that there was a very small amount of time from the onset of decedent's last heart episode until his death. Dr. Richard Schultz, a pathologist and physician, testified that it usually takes one-half to one hour for a myocardial infarction to develop, during which time there would be severe chest pain.

On Saturday, July 12, plaintiff and a group of relatives went to see Harry Behrens at his office. The relatives were upset about Mr. Hight's untimely death and seemingly unwilling to accept any explanation Mr. Behrens could give to their questions. Plaintiff said very little, with the relatives doing most of the talking. Mr. Behrens explained that the mortuary prefers to have the embalming done as soon as possible, especially in the hot summer months, in order to make the remains more presentable. He also explained that an autopsy could still be requested if they desired, and he furnished them with the necessary papers. The fact that the body had been embalmed would not prevent doing an autopsy. It would prevent tests normally done with the blood, such as drug analysis. No autopsy was ever requested.

On Saturday also, plaintiff and a sister-in-law went to view the body and discovered a wet spot on decedent's suit. Plaintiff was distraught about this and testified, "His whole right side was all wet, quite a large area." Harry Behrens testified that it was a very small amount of water, which may have spilled from a pan holding the flowers, and that they checked it and dried it up. Testimony indicates that at no time did plaintiff ever request possession of the body, nor did she indicate that she wanted any other mortuary to handle the funeral.

Some time subsequent to the funeral, plaintiff talked to Mr. Rostad. She expressed her satisfaction with the funeral, stating that she would not have taken Mr. Hight anywhere else, and also that she had wanted the body embalmed since she wanted a funeral. She indicated to Mr. Rostad her dissatisfaction with the wording in the death certificate, and wanted it explained. She expressed the concern that her children might be affected in getting jobs in the future if the employer found out that their father had a history of angina/pectoris. Also, she questioned how her husband could have had a heart attack when he was so healthy.

The circumstances were particularly distressing to plaintiff. She felt as though everything had been taken out of her hands; that she was prevented from going to see her husband after being notified of his death, and that she did not know the actual cause of death.

Plaintiff described her emotional state for some time after the funeral as "a wreck," marked with bad dreams and sleepless nights. At no time during the course of events recited herein, and subsequent months, did plaintiff see a doctor for purposes of obtaining treatment or medication for her depressed state of mind, nor did she seek other professional treatment. Plaintiff was married to Fred Chisum on April 30, 1976.

■ "On plaintiff's appeal from judgment upon a verdict for the defendant, the evidence must be viewed in a light most favorable to the defendant and we must accept the evidence and any reasonable inferences therefrom which tend to support the verdict." *Northwestern Bell Tel. Co. v. Henry Carlson Co.*, 83 S.D. 664, 667, 165 N.W.2d 346, 347 (1969).

█ The successful party is entitled to the benefit of his version of the evidence and of all inferences fairly deductible therefrom which are favorable to the court's action. *Potter v. Anderson,* 85 S.D. 142, 178 N.W.2d 743 (1970).

We conclude that the evidence herein, and the inferences fairly deducted therefrom, adequately support the verdict.

Plaintiff's first assignment of error and principal contention on this appeal is as follows: "(1) That the Court erred in imposing upon the plaintiff a burden of proof requiring her to prove that the defendants acted intentionally or maliciously in interfering with plaintiff's right to custody of her husband's body or in making incisions in the body without her consent." In this regard, plaintiff also objects to the refusal of the trial court to give certain proposed instructions, and the giving of other instructions, over objections, which imposed the intentional or malicious standard.

Plaintiff had alleged that defendants withheld from her custody of her husband's body, in violation of SDCL 34–26–14 [1] and SDCL 34–26–16,[2] and that they made incisions in the body without her consent, in violation of SDCL 34–26–13.[3]

The court's instruction Number 10 provides in part:

> In this action, the Plaintiff, Agnes P. Hight Chisum, has the burden of proving the following issues:
>
> 1. That the Defendants acted intentionally or maliciously in:
>
> (a) interfering with Plaintiff's right to custody of the body of her deceased husband, and/or
>
> (b) making dissections and making incisions into the body of the Plaintiff's deceased husband without her consent.
>
> 2. That the intentional or malicious act(s) of the Defendants was a proximate cause of the Plaintiff's mental anguish, and
>
> 3. That the Plaintiff has suffered the damages alleged.

Plaintiff urges a burden of proof based on negligent rather than intentional or malicious conduct and cites as a basis the new position set forth in Restatement (Second) of Torts § 868 (1979), which provides: "One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body." The prior edition of the Restatement read as follows: "A person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body is liable to the member of the family of such person who is entitled to the disposition of the body." Restatement of Torts § 868 (1939).

The new position was first proposed by the Restatement writers in a 1970 tentative draft, but it was not until the present volume, copyrighted in 1979 and distributed in February or March, 1979, that this became the official position of that text. The present Restatement represents the minority view which we are not inclined to follow.

It is noted in 48 A.L.R.3d 261, 265, that:

1. SDCL 34–26–14 reads:

   The person charged by law with the duty of burying the body of a deceased person is entitled to the custody of such body for the purpose of burying it; except that in the cases in which an inquest is required by law to be held upon a dead body, by a coroner, such coroner is entitled to its custody until such inquest has been completed.

2. SDCL 34–26–16 reads in part:

   The duty of burying the body of a deceased person and providing the grave with a permanent concrete, metal anchored in concrete or stone marker devolves upon the persons hereinafter specified:

   (1) If the decedent was married the duty of burial devolves upon the husband or wife;

3. SDCL 34–26–13 reads:

   Every person who makes or procures to be made any dissection of the body of a human being, except by authority of law or in pursuance of a permission given by the decedent, is guilty of a Class 1 misdemeanor.

While some courts appear to have recognized that damages for mental anguish may be recovered in a tort action against an undertaker even though only simple negligence was alleged, most courts entertaining tort actions against undertakers have held that in order to recover for mental anguish, the plaintiff must show some wilful, wanton, or malicious conduct on the part of the undertaker. (footnote omitted)

To support the first assignment of error, plaintiff cites as most in point the cases of *Larson v. Chase*, 47 Minn. 307, 50 N.W. 238 (1891), and *Sworski v. Simons*, 208 Minn. 201, 293 N.W. 309 (1940). *Larson v. Chase* is a leading, widely followed case which expresses the modern view that there exists a legal right to possession of a dead body for purposes of preservation and burial, and that interference with that right is an actionable wrong. It extends a remedy where otherwise none would exist, but it does not specifically address itself to the issue of what burden of proof was applied. In *Sworski v. Simons*, supra, an action for the withholding of a body and the unauthorized embalming of it, the court stated that any interference with the right of the next-of-kin to possession of the body constitutes an actionable wrong, and that the next-of-kin is entitled to recover from the wrongdoer all damages which are the proximate consequence of the wrongful act, including mental suffering. The court made no reference to any rule requiring proof of a willful, wanton or malicious act; however, the complaint seeking damages therein alleged that defendants unlawfully, willfully and maliciously took possession of a body. The court, in citing the *Larson* case in *Sworski v. Simons*, specifically stated as follows: "The complaint in this case is the same in its ultimate allegations as that considered in the leading case of *Larson v. Chase* [citations omitted]." 208 Minn. at 205, 293 N.W. at 311. It is also noted that *Sworski* was a 4–3 split decision, and that the acts complained of were of a far more serious nature, in that the undertaker was alleged to have withheld the body from the parents by first attempting to extract a fee for services, and then by requiring them to sign some papers before they could view their son's body.

■ We adhere to the position taken in the case of *First National Bank of Jacksonville v. Bragdon*, 84 S.D. 89, 92, 167 N.W.2d 381, 382 (1969), wherein the court said:

The rule seems to be well established that where the act is willful or malicious, as distinguished from being merely negligent, recovery may be had for mental pain, though no physical injury results. . . . The important elements seem to be that the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness.

■ The law applicable to this case is summed up in *State Farm Mutual Auto. Ins. Co. v. Village of Isle*, 265 Minn. 360, 367, 368, 122 N.W.2d 36, 41 (1963), wherein the court states as follows:

It is well established that damages for mental anguish or suffering cannot be sustained where there has been no accompanying physical injury . . . unless there has been some conduct on the part of defendant constituting a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction, or other like willful, wanton, or malicious misconduct.

They cite, among other authority, *Larson v. Chase*, supra.

■ We conclude that the trial court herein properly imposed upon plaintiff the burden of proving that the defendants had acted intentionally or maliciously, and find no error in the instructions given the jury.

We have considered plaintiff's remaining assignments of error regarding the court's restriction of certain testimony and find the same to be without merit.

The judgment is affirmed.

All the Justices concur.

BERNDT, Circuit Judge, sitting for HENDERSON, J., disqualified.