John C. GROSS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 74–4030.

United States District Court, D. South Dakota, S. D.

March 9, 1981.

Dennis C. McFarland and John N. Gridley III, Sioux Falls, S. D., for plaintiff.

Raymond P. Murley, Asst. U. S. Atty., Sioux Falls, S. D., for defendant.

## MEMORANDUM DECISION

NICHOL, District Judge.

This action was instituted under the Federal Tort Claims Act (FTCA), 28 U.S.C. section 2671 *et seq.* (1976) and section 1346 of the same title, by the plaintiff, John C. Gross, against the defendant, United States of America, for the intentional infliction of emotional distress allegedly suffered by the plaintiff. More specifically, Gross alleges that the actions of the defendant's employees and agents, the Lake County Committee of the Agricultural Stabilization and Conservation Service (ASCS), concerning his participation in the Feed Grain Program (FGP) for the years of 1965, 1968–1971 constitute the intentional infliction of emotional distress. Plaintiff seeks monetary relief.[1]

Trial was had before the Court without a jury. After consideration of all the evidence and arguments of counsel the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The plaintiff in this action, John C. Gross, is a farmer in Lake County, South Dakota. In March, 1965, Gross purchased 320 acres of land from Robinson. Robinson had a tenant farming the north quarter of his land. At the time of the sale the tenant, Sederstrom, had a first option to purchase the land. The option was never exercised. When Gross purchased the land he continued to rent the north quarter to Sederstrom. The south quarter, which Gross custom farmed, was put into the Soil Conservation Program.

Gross applied for and was denied participation in the FGP for 1965. The Lake County ASCS Committee stated that he had reduced tenants in violation of the regulations.[2] Since he did not have any tenants in 1964, Gross did not understand how he could have eliminated tenants. Therefore, he appealed to the state committee. The state committee reversed the county committee's decision. When Gross returned to the county committee they informed him that they did not care what was said by the state committee, Gross would not be allowed to participate in the 1965 FGP. No reasons were given for their decision. At the same time, however, the county committee was sending reasons for Gross' denial to the state committee and the Washington office of ASCS.

Further perplexed, Gross then wrote to the Deputy Administrator of State and County Operations (DASCO) asking for an official reason for his denial. He received two replies. The first reply was a letter dated October 6, 1965, from Bob Bergland, then DASCO, stating that he was denied entry to the FGP because he was a custom farmer. The evidence shows that Gross was a custom farmer at this time although he offered, for incentive purposes, ten percent of the gross profits to his custom operators. It was Bergland's opinion that this action by the county committee was improper, since there was no regulation pro-

---

1. This is not the first time plaintiff has sought judicial relief for the acts alleged. In 1968, Gross sued two members of the Lake County ASCS committee for maliciously soliciting statements which resulted in a denial of his application to participate in the 1966 FGP. *Gross v. Sederstrom*, CIV69–75 (D.S.D. May 26, 1968), *aff'd*, 429 F.2d 96 (8th Cir. 1970). In

1974, Gross sought to recover for the allegedly wrongful withholding of payments for his participation in the FGP for the years 1968, 1970–71. *Gross v. U.S.*, 505 F.2d 1271 (Ct.Cl.1974). In each instance he has been denied recovery.

2. 7 C.F.R. 775 (1964–1965).

viding for the denial of FGP participation for custom farmers. Of greater importance to this case, however, is that Gross applied for FGP benefits in March, 1965, and was denied, yet he did not enter his farming arrangements until May of that year.

The second reply received by Gross on December 1, 1965, was from C. E. McAdam, acting DASCO. McAdam states in his letter that Gross was rightfully denied participation in the FGP based on the county committee's determination that Gross' contractual agreement with his tenant was contrary to the intent of the program that each tenant should receive a fair share of the program's benefits. The agreement referred to by McAdam was Gross' incentive policy with his custom operators. Since they were to receive ten percent of the gross profit, the ASCS viewed them as tenants with at least a ten percent interest in the FGP. Thus, up to this point Gross was given three totally different reasons for his denial to the 1965 FGP.

At the direction of Bergland a meeting was set for March 11, 1966, between Gross and the county and state committees in order to clear up the problems involved in the 1965 denial. According to Gross only his farm plans for 1966 were discussed. It was Gross' testimony that the meeting was intended for a discussion on the 1965 denial. This testimony is supported by the memorandum of Bergland to the state committee directing that the meeting be arranged. Yet three members of the county committee who were interviewed by an Agent Torbert from the Office of the Investigator General (OIG) of the United States Department of Agriculture stated that Carvel Johnson, the Lake County ASCS Office Manager, informed them that the meeting was set up to discuss Gross' 1966 participation in the FGP. Further, the minutes of the March 11th meeting contain no discussion of the 1965 denial. Gross testified that he attempted to discuss the 1965 problems to no avail. He was told that he would receive the committee's determination.

Even though uninformed of the results of the March 11th meeting, on March 25, 1966, Gross signed up for participation in the 1966 FGP. After completing his application Gross picked up his mail. Included in his mail was a letter dated March 24, 1966, from the state ASCS committee stating that the state committee affirmed the denial by the county committee of Gross' application for the 1966 FGP. At the time the letter was written Gross had not even applied for the 1966 FGP.

Gross then called Washington and spoke with Ray Fitzgerald, who told him he could see his file. Upon reviewing his ASCS file Gross found two letters signed by his previous tenant, Sederstrom, attesting to Gross' unreasonable renting terms, which effectively denied him his 1965 FGP benefits, and that he was forced off the land in 1966. Sederstrom later repudiated the statements. He testified in a deposition that the chairman and vice chairman of the county committee visited him and egged him on with statements concerning Gross' unreasonable renting terms, and that the committee did not want custom farmers in the program. At that time Hanneman and Meyers gave Sederstrom the two statements, which they had written, and asked him to recopy them in his own writing. He did this and signed them. These were the statements that were in Gross' file and were used to deny him participation in the FGP for 1965 and 1966.

In the Torbert report, which was an investigation of the Lake County ASCS office, Sederstrom states that he signed the 1965 lease with Gross with full knowledge of its terms. He also states that the second statement with the allegation that Gross forced him to give up his land in 1966 was completely false. He further told Torbert that he never planned on remaining on Gross' land after 1965 because he had negotiated to purchase his own land.

With this information Gross appealed his denial for the 1966 FGP to Washington where the state and county committees' decisions were reversed. The Washington committee stated that a new owner is not bound by a previous owner's landlord-tenant relationships, and that custom farming,

alone, is not sufficient reason to keep Gross out of the FGP. The county was instructed to take action without delay. On April 29, 1966, the county committee notified Gross that he could participate in the FGP. It is interesting to note that after the meeting in Washington where the state and county decisions were reversed, Charles Cox, who conducted the hearing, advised Gross that he should be aware of the possible adverse results in his future dealings with those committees.

In September, 1966, the county committee sent Gross a notice of noncompliance for the 1966 FGP. According to Gross' testimony it was then far too late in the crop season to get back into compliance. When he asked at the county office what he could do, Carvel Johnson told him that maybe he could go back to Washington.[3]

In 1969 Gross was again denied FGP participation.[4] In a letter dated April 16, 1969, the county committee denied Gross participation because the committee claimed to have evidence that Gross had eliminated tenants in anticipation of participation in the FGP, that his agreements with his tenants required unfairly that they pay over their FGP payments, that he changed the status of his tenants to deprive them of payments under the FGP, and that he reduced the tenant's unit size. At the time in question Gross had four tenants.

The county committee failed to inform Gross of his right to receive reconsideration at the county level, nor did the committee supply him with the evidence upon which they relied in making their determination.[5] When he requested the evidence he was informed that there were no signed statements from the tenants involved, only the notes of Carvel Johnson, the county office manager, taken during interviews with the tenants. Subsequently it was learned that the tenants refused to sign any statements. Gross then requested that the evidence be forwarded to the state committee for use in his appeal. Yet when he appeared before the state committee, there was no evidence concerning his 1969 denial. The state committee, however, affirmed the county committee's decision.

Gross appealed to Washington. There he was told that if he obtained statements from the tenants involved which refuted the county committee's factual findings, he should be allowed in the program. Gross obtained the statements from three of the four tenants. Although the fourth tenant, Ray Hanneman, refused to give either Gross or the county committee a signed statement, Gross had a letter from him that stated he was giving up the land for health reasons. The Washington committee, however, affirmed the state and county committee.

It is interesting to note that although the information that was provided to OIG Agent Phillips supports the county committee's determination, the statements of those same tenants taken under oath in depositions tend to refute the committee's findings. For example, the Phillips report states that Hanneman was forced off his land. Yet it makes no mention of Hanneman's letter to Gross about his health. The report also states that Hanneman felt the arrangement he had with Gross was unfair. Yet in his deposition Hanneman states that he and Gross got along well. Phillips also states in his report that another tenant, Ray Minneart, felt he received a bad deal from Gross. In his deposition Minneart clearly states that he signed the agreement with Gross with full knowledge of its terms.

Gross attempted to get reconsideration for his 1969 denial. The request was denied

---

3. Although Gross was allowed to participate in the FGP for 1968, it was not without some trouble. Even though the requests by the county committee do appear to have been somewhat harassing, the Court does not feel they constituted the intentional infliction of emotional distress.

4. These years (1968–71) were addressed by the Court of Claims decision. 505 F.2d 1271 (Ct.Cl. 1974). Discussion of the application of the doctrine of collateral estoppel to these years will be taken up in the Court's conclusions of law, infra.

5. 7 C.F.R. sections 708.2 and 780.9(b) (1969).

at all levels. This continued through 1971. Gross did, however, participate in the FGP for the years 1968, 1970 and 1971.

Just prior to Thanksgiving, on November 23, 1971, Gross received a letter from Carvel Johnson stating that an OIG investigation revealed he had violated the landlord-tenant provisions of the ASCS regulations for the years of 1968, 1970 and 1971. Because of those violations Gross was required to refund the payments for those years in the amount of $7,904.70. He was then put on the federal debt register, and the government began setting off the debt with other program payments.

The county committee's decision to require a refund was based on the Phillips report. In 1970 the county committee, after meeting with Gross and his tenants, was satisfied with the situation. Once the committee received the report they demanded a refund. That report, however, contains allegations that are inconsistent with statements taken under oath. Further, many of the regulations upon which the committee based its decision were compiled in a manual that appeared to be in direct conflict with the regulations.

Although one of the tenants involved, William Swier, told the committee at the 1970 meeting that he was satisfied with his arrangement with Gross, the committee later alleged that Swier had been forced to pay over his FGP benefits to Gross. There is evidence, however, that the money paid to Gross constituted the rental payment for Swier's use of Gross' storage barn. Further, the evidence shows that the arrangement not only provided Swier with a storage area for his machinery but also relieved him of the burden of caring for the diverted acres. Based on the fact that Swier signed a lease for 1971 one month following the payment of rent for the storage barn, it does not appear that he was dissatisfied.

In a letter subsequently submitted to the then Attorney General Richard Kleindienst from a regional attorney for the Department of Agriculture, it was stated that Ray Hanneman was satisfied with his arrangement with Gross, and that another tenant, Wayne Hanson, did not feel that he was forced to turn over any payments to Gross. Although the letter stated that there were indications of criminal conduct the merits of such an action were viewed with skepticism. Prosecution was denied.

Gross' mental condition deteriorated during the years he was involved in the above controversy with ASCS. Robert Reddell, a banker and farmer who knows Gross well from college and in Madison, testified that Gross was well liked, compatible, and personable prior to 1965. From the years around 1965, however, he recognized a change in Gross' personality. He became paranoid, upset, and obsessed by his problems with the ASCS.

His wife, Millie, testified that in 1965 and 1966 Gross would become moody and upset over the letters he received from the ASCS office. In the years 1969–71, however, things became much worse. He was completely despondent. Although both of them sought professional help, their marriage continued to deteriorate until in 1972 the couple separated. His relationship with his children became extremely strained. He had become so obsessed with people doubting him that he began taking notes when he spoke with his children.

Gross began by being incredulous about the actions of the ASCS, but this later turned to anger and frustration. He began losing sleep. He sought counseling for his marriage in 1970, went to a psychiatrist and to Lutheran Social Services in an attempt to hold his family together. Although he and his family presently live together, there is very little left of a family relationship.

A number of psychiatrists testified, by deposition, as to the state of Gross' mental health. There was agreement amongst all that the problems with the ASCS played some role in his deteriorating condition. Dr. Daryl P. Stephanson testified that Gross' condition was a direct result of his controversy with the ASCS. He diagnosed Gross as suffering from chronic anxiety and depression. He explained that normally situational reactions to stress, such as anxiety and depression, are short-lived. But the

present case was so overwhelming and drawn out that Gross has suffered an almost permanent state of anxiety and depression. He concluded that there was a reasonable medical certainty of a causal connection between Gross' problems with the ASCS and his medical condition. It was his opinion that Gross' condition became irrevocable at the time the ASCS committee demanded a refund, or in November, 1971.

Dr. Leander, who saw Gross in 1972, testified that Gross was depressed, paranoid, and suspicious. Although he felt the main fault was with Gross' marital problems, he testified that they began about 1969, the same time he was experiencing the problems with the ASCS. office. This is supported by the testimony of Gross' wife, who felt the problems with the ASCS caused the problems in their marriage. It was Dr. Leander's opinion that Gross' problems with the ASCS were a precipitating factor in his mental deterioration. He concluded, however, that although it was his opinion that Gross' mental problems predated his ASCS problems, the ASCS problems could have made his condition worse.

Although Dr. Bean agreed that Gross was of a paranoid inclination, it was his opinion that his mental deterioration was enhanced by his problems with the ASCS. He felt Gross was merely in the developing stage of a mental problem when he received some real damage, distresses, and bureaucratic abuses at the hands of the government. He concluded that receiving the kind of attacks and abuses that Gross alleged he had received would greatly increase the development of the illness.

Jurisdiction over FTCA cases is vested in this Court by virtue of 28 U.S.C. sections 2671–2680 (1976) and section 1346(b) of the same title. It is stipulated by and between the parties that Gross filed his administra-

tive claim on August 7, 1973, thus exhausting his administrative remedies as required by 28 U.S.C. section 2675(a).

In connection with the determination of the Court's jurisdiction to hear the present case it also must be determined if the alleged tort falls within the exceptions to the FTCA enunciated in section 2680. Section 1346(b) places liability upon the United States for negligent or wrongful acts or omissions. Subsection (h) of 2680 excepts from the FTCA certain intentional torts.[6] It has been held that the section applies to all intentional torts. It is the opinion of this Court, however, that because of the detailed listing and the absence of general terms only the torts mentioned are to be excluded. *Ira S. Bushey & Sons, Inc. v. U. S.*, 276 F.Supp. 518 (E.D.N.Y.1967), *aff'd*, 398 F.2d 167 (2d Cir. 1968); *Birnbaum v. U. S.*, 436 F.Supp. 967 (E.D.N.Y.1977), *aff'd in part, modified in part*, 588 F.2d 319 (2d Cir. 1978); *Cruikshank v. U. S.*, 431 F.Supp. 1355 (D.Hawaii 1977).[7]

Section 2680(a) excepts from the FTCA all acts or omissions that constitute "a discretionary function or duty on the part of a federal agency or an employee of the Government." The defendant alleges that this subsection excepts from liability the acts of the ASCS committee and employees. Although this question was addressed and decided against the defendant in this Court's memorandum decision on the defendant's motion for summary judgment, it deserves further discussion at this point. The discretionary function exception is limited to decisions made at the planning and policy making level rather than the operational level; decisions at the latter level may be actionable even though they involve an element of discretion. *Driscoll v. U. S.*, 525 F.2d 136 (9th Cir. 1975); *accord, Thompson v. U. S.*, 592 F.2d 1104 (9th Cir.

---

**6.** Section 2680(h) provides in part that the FTCA does not apply to "(a)ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights...."

**7.** *Cf. Anderson v. U. S.*, 548 F.2d 249 (8th Cir. 1977). The court in *Anderson* was addressing claims based on an arrest. To the extent that claims arose from the arrest they were barred by the express exceptions under section 2680(h) such as malicious prosecution, abuse of process, libel, and slander.

1979); *Cruikshank v. U. S.*, 431 F.Supp. 1355 (D.Hawaii 1977). For example, in the present case the county committee attempted to make a policy of excluding custom farmers from the FGP and were consistently reversed, thus demonstrating that they were not a policy making body. The mere exercise of judgment is not equal to a discretionary function. *Driscoll v. U. S., supra; Cruikshank v. U. S., supra.* Therefore it is not a sufficient defense for the government when sued under the FTCA merely to point out that decision making power was exercised. *Smith v. U. S.*, 375 F.2d 243 (5th Cir. 1967), *cert. den.*, 389 U.S. 841, 88 S.Ct. 76, 99 L.Ed.2d 106 (1967); *accord, Downs v. U. S.*, 522 F.2d 990 (6th Cir. 1975); *Pigott v. U. S.*, 451 F.2d 574 (5th Cir. 1971). The Court finds that although there may have been a small element of judgment or decision making on the part of the ASCS committee and office, it is not sufficient enough to give their actions protection from being tested through the vehicle of a tort suit.

In deciding questions under the FTCA the law of the place where the act occurred governs the Court's decision. *Hungate v. U. S.*, 626 F.2d 60 (8th Cir. 1980). Thus in the present case South Dakota law governs the resolution of this case. South Dakota recognizes the independent tort of intentional infliction of emotional distress. *First National Bank of Jacksonville v. Bragdon*, 84 S.D. 89, 167 N.W.2d 381 (1969). "The rule seems well established that where the act is willful or malicious, as distinguished from being merely negligent, recovery may be had for mental pain, though no physical injury results." *First National Bank of Jacksonville v. Bragdon, supra; accord, Chisum v. Behrens*, S.D., 283 N.W.2d 235 (1979). The important elements are "that the act is intentional, that it is unreasonable, and that the actor should recognize it is likely to result in illness." *First National Bank of Jacksonville v. Bragdon, supra; Chisum v. Behrens, supra.*

Based on the doctrine of collateral estoppel, addressed by this Court in its memorandum decision on the defendant's motion for summary judgment, Gross is barred from keying the above elements to certain facts in the present controversy. In its memorandum decision this Court held that since certain alleged violations were raised and discussed in Gross' suit in the Court of Claims, Gross could not relitigate those issues in the present suit. The Court of Claims decision dealt specifically with the denial of FGP participation for 1969, and the refund for 1968, 1970–71. Gross is precluded, in discussing those years, from claiming that the ASCS violated its own regulations in denying him FGP participation and requiring a refund. Those regulations provide that the county committee cannot waive or modify its regulations (7 C.F.R. 775.403(b)), that the county committee may deny a producer participation in the program if his contract with his tenants does not provide for a fair and equitable division of payments (7 C.F.R. 775.418(b)(c)), and that the above regulations are not applicable to a cash rent tenant not living on the farm or earning 50 percent or more of his income from the farm (7 C.F.R. 775.419(b)). The alleged violation of those regulations cannot form the basis for recovery in this case. As pointed out by this Court in its memorandum decision, however, this cause of action is based only in part on the violations of those regulations. Further, apart from whether the actions of the ASCS violate the regulations for those years, if their actions constitute the intentional infliction of emotional distress under the standard set out by South Dakota law, Gross can prevail.

The Court finds that based on the standard set out by South Dakota law, the actions of the Lake County ASCS constituted the intentional infliction of emotional distress. As previously noted, the elements are that the actions be intentional, unreasonable, and that the actor should recognize it is likely to result in illness. *First National Bank of Jacksonville v. Bragdon, supra.* There is little doubt that the ASCS intended to take the actions it took in regard to Gross. The evidence shows that the conduct of the ASCS was unreasonable, and, as this Court believes, was done to an extent that the ASCS should have recognized that it would result in illness to Gross.

From 1965 through 1971 the Lake County ASCS attempted to keep Gross out of the FGP. In order to insure their decisions were not reversed the ASCS used false statements of tenants; when no statements were given they relied on opinions of the office manager which were not supported by the tenants. Some of those same tenants later claimed that the statements were completely false. Other statements were contradicted by statements given under oath. The ASCS went so far as to go to one tenant with prepared statements and request that he copy it in his own handwriting. These were used to deny Gross FGP participation for the years 1965 and 1966.

When Gross attempted to discuss the 1965 denial the county committee refused even though the meeting was scheduled for that purpose. Some of the committee members knew nothing of the purpose; they stated that Carvel Johnson set the meeting for a discussion of Gross' 1966 plans. Yet the meeting was of the combined state and county committees. At that same meeting, before Gross even applied for the 1966 FGP, the committee denied him participation for that year. The decision was later reversed after Gross appealed to Washington. After all Gross' crops were in for 1966, the committee then held him to be out of compliance for that year. When he requested advice on how to get back into compliance he was told that he may have to go back to Washington.

In requiring Gross to refund the 1968, 1970–71 FGP payments the county committee relied on reports that were riddled with inconsistencies. They subsequently recommended Gross for criminal prosecution.

For these reasons and also those stated previously in this opinion the Court finds the actions of the ASCS to be unreasonable to the extent that the ASCS should have recognized that they were putting Gross in a state of mental distress. This occurred over a period from 1965–1971. Further, the medical testimony demonstrates that Gross may be in a permanent state of anxiety and depression, possibly paranoia.

It is therefore the finding of this Court that the plaintiff, John C. Gross, is entitled to damages in the amount of $35,000.00 for mental distress. The clerk may enter an appropriate judgment in accordance with this memorandum decision.