John C. GROSS, Appellee,

v.

UNITED STATES of America, Appellant.

No. 83–1280.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1983.

Decided Dec. 19, 1983.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., Leonard Schaitman, Anthony J. Steinmeyer, Marc Johnston, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellant.

Dennis C. McFarland, John N. Gridley III, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY and ARNOLD, Circuit Judges.

HEANEY, Circuit Judge.

The United States appeals from a judgment entered on remand from our previous decision in *Gross v. United States,* 676 F.2d 295 (8th Cir.1982). On remand, the district court found continuing tortious conduct by the government within the statute of limitations period, and awarded interest on the judgment from March 9, 1981, the date the first judgment was entered. We affirm the district court's finding of tortious conduct but reverse the award of interest.

BACKGROUND:

This litigation involves a lengthy dispute between John C. Gross and the Agricultural Stabilization and Conservation Service (ASCS) over his eligibility for feed grain program payments. Both the district court's first opinion, *Gross v. United States,* 508 F.Supp. 1085 (D.S.D.1981), and our opinion, 676 F.2d 295 (8th Cir.1982), detailed that conduct. To summarize, the ASCS denied Gross participation in the feed grain program in 1965 and 1969, and required him to refund program payments for 1968, 1970, and 1971. The ASCS had attempted to keep Gross out of the program at least in part because he was a custom farmer. In so doing, it collected and used false and unsupported statements by Gross's tenants. We discuss the ASCS's conduct in greater detail *infra.*

Gross filed suit in federal district court under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680 (1976 & Supp.1981), alleging that ASCS's actions constituted intentional infliction of emotional distress. Following a trial without a jury, the district court found that the actions of ASCS from 1965 through 1971 were intentional and unreasonable, and that ASCS should have recognized it would put Gross in a state of mental distress. The court found further that Gross "may be in a permanent state of anxiety and depression, possibly paranoia." It awarded him damages of $35,000. *Gross v. United States, supra,* 508 F.Supp. at 1091–1092.

The United States appealed this judgment. We affirmed, except in regard to

the government's argument that the FTCA's statute of limitations barred Gross's action. Under the FTCA, a tort claim against the United States is barred unless it is presented within two years after the claim accrues. 28 U.S.C. § 2401 (1976 & Supp.1981). Gross filed his claim on August 7, 1973. We concluded that ASCS's actions constituted a continuing tort, and thus Gross's claim would accrue from the date of the last tortious act. We were unable to determine on the record then before us, however, whether a tortious act occurred after August 7, 1971. For this reason, we remanded to the district court for additional findings to determine whether the ASCS's demand for refund—made in November, 1971—constituted tortious conduct.

On remand, the district court found that several actions by the ASCS after August 7, 1971, constituted intentional, willful, and tortious conduct entitling Gross to the damages awarded in the earlier judgment.[1] The government then brought this appeal.

DISCUSSION:

Because ASCS's conduct occurred in South Dakota, that state's laws determine whether it was tortious. *See Gross v. United States, supra,* 508 F.Supp. at 1091; *Hungate v. United States,* 626 F.2d 60 (8th Cir.1980). Under South Dakota law, one may recover for negligent infliction of mental or emotional distress only if there is accompanying physical injury. In order to recover for mental distress where, as in this case, there is no physical injury, the defendant's conduct must be willful or malicious, as distinguished from being merely negligent. *Chisum v. Behrens,* 283 N.W.2d 235, 240 (S.D.1979); *First National Bank of Jacksonville v. Bragdon,* 84 S.D. 89, 167 N.W.2d 381, 382 (1969). The important elements are that "the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness." *Id.*

As mentioned above, we have already determined that ASCS's conduct from 1965 until August 7, 1971, constitutes a continuing tort of intentional infliction of emotional distress. In order to determine whether this tortious conduct continued after that date, placing it within the statute of limitations period, it is necessary to appreciate the context of ASCS's November, 1971, demand for refund.

From 1965 to 1971, the ASCS had attempted to keep Gross out of the feed grain program. The county committee denied his participation in 1965 initially because it contended he reduced the number of tenants on his farms in violation of program regulations. In fact, Gross had no tenants in 1964. He appealed to the state ASCS committee which reversed the county committee decision, but the county committee nevertheless continued to deny his participation in the program. Upon his further appeal to the Deputy Administrator of State and County Operations, Gross learned that the county committee improperly denied him participation because he was a custom farmer, and because it contended that Gross did not give his tenant a fair share of the program's benefits. The county committee

---

1. In finding XII, the district court stated:
    On November 23, 1971, the Lake County A.S.C.S. Committee, through its Executive Director, Carvel Johnson, notified the plaintiff that he must repay the A.S.C.S. payments made to him for the years 1968, 1970, and 1971 for the reason of violation of A.S.C.S. landlord/tenant regulations, notwithstanding the fact that the Lake County A.S.C.S. Committee and officials above them in the chain of command knew, or should have known, that such violations had not taken place and knew that there was no foundation for such action.
    In finding XVII, the district court found that the actions of the Lake County ASCS Commit-

tee were intentional, willful, and tortious, and repeated this statement in Conclusion of Law II. We think it clear from reading the entire opinion that the district court was applying the same standard in the hearing on remand that it did in the original trial. We note that we implicitly approved the original trial's standard in our first opinion and thus it becomes the law of the case. We need not reach, in this opinion, the question of whether one may recover for intentional infliction of emotional distress under current South Dakota law if the actor's conduct is reckless rather than intentional. *See Verbouwens v. Hamm Wood Products,* 334 N.W.2d 874, 875–876 (S.D.1983).

supported the latter charge with letters from Gross's tenant, Sederstrom; these letters were later repudiated by Sederstrom as false and merely solicited by ASCS in its effort to deny Gross program participation because he was a custom farmer.

ASCS allowed Gross to participate in the program in 1968, but denied him participation in 1969. Again, ASCS contended that Gross had eliminated tenants in anticipation of participating in the program, and had unfairly required them to transfer their program payments to him. *Gross v. United States, supra,* 508 F.Supp. at 1088. Gross appealed the ASCS county committee's decision without success. He did participate in the program in 1970 and 1971. The district court found that this conduct by the county committee was intentional, unreasonable, and caused Gross emotional distress. We affirmed these findings.

■ The question now before us is whether the November, 1971, demand for refund of Gross's 1968, 1970, and 1971 program payments was a continuation of ASCS's earlier tortious conduct. In its first decision, the district court found that in demanding a refund for these years in its November 23, 1971, letter to Gross, "the county committee relied on reports that were riddled with inconsistencies." *Gross v. United States, supra,* 508 F.Supp. at 1092. We could not determine whether this amounted to tortious conduct, and so remanded for additional findings. We suggested that the district court address whether the ASCS committee was entitled in its demand for a refund to rely on an investigation by the Office of the Inspector General (OIG) of the United States Department of Agriculture (USDA) which noted irregularities between Gross and his tenants in the years in question. We observed:

> [t]he ASCS committee ordinarily would be entitled to rely on such a report for its further action unless it knew that the report and its conclusions were incorrect, nevertheless requesting a refund and recommending Gross for criminal prosecution.

*Gross v. United States, supra,* 676 F.2d at 300 n. 12.

In fact, two reports are involved here. The Phillips Report, dated February 24, 1971, was written by Jack L. Phillips, the Deputy Director for the ASCS Northwest Area Office. This report concluded that "one tenant had been coerced into turning his feed grain price support payment over to Gross" in 1970, and that three of four 1968 tenants advised that they were forced off the land in 1969. In its first decision, the district court found these conclusions inconsistent with statements by the same tenants taken under oath. The district court thus concluded the Phillips Report was not a sufficient basis for the county committee's conduct. *Gross v. United States, supra,* 508 F.Supp. at 1088.

William Pelletier of OIG filed a second report on August 19, 1971. This report serves as the focus for evaluating ASCS's conduct after August 7, 1971. The district court found on remand that the state ASCS committee reviewed the Pelletier Report and could find no evidence on which to take action against Gross. On September 2, 1971, the state committee forwarded the report and this finding to the Northwest Regional Director. The Northwest Regional Director responded to the state committee on November 8, 1971, by directing the county committee to determine whether Gross had violated the ASCS landlord-tenant regulations and take action accordingly. On November 15, 1971, the county committee determined that Gross had violated the regulations in relation to tenants Swier, Hanneman, and Hansen by forcing them to pay over to him their ASCS program payments, and that he therefore must refund his ASCS payments for the years 1968, 1970, and 1971. The county committee wrote to Gross on November 23, 1971, citing the OIG investigation and demanding the refund. The district court concluded that the Pelletier Report in fact showed that neither Swier, Hansen, nor Hanneman were pressured or forced to make any payments to Gross.

Thus, the question is no longer whether the Pelletier Report is so "riddled with inconsistencies" that the county committee was not entitled to rely on it in proceeding against Gross, but rather whether the district court properly found that the report cleared Gross of wrongdoing, and that the ASCS tortiously proceeded against him anyway. Under Fed.R.Civ.P. 52(a), we cannot set aside a district court's findings of fact unless they are clearly erroneous. Based upon our review of the district court's additional findings and the related evidence in the record, we cannot conclude that the district court clearly erred in finding the November 23, 1971, demand for refund a continuation of ASCS's tortious conduct.

In its November 23, 1971, letter, the county committee cited the OIG investigation as finding that Gross had violated ASCS's landlord-tenant regulations which provide that a landlord may not receive any program payments

> if there existed between the landlord and tenant, * * * a lease, contract, agreement or understanding, unfairly exacted or required by the landlord, the effect of which was to force the tenant to pay over to the landlord any payment earned by the tenant under the program.

Appendix at 181; see 7 C.F.R. § 794.3. The record reveals sufficient evidence for the district court to find the ASCS knew through the Pelletier Report that Gross's agreements with tenants Hanneman and Hansen did not unfairly exact, require, or force them to transfer their program payments to him.[2]

Hanneman did agree to transfer his entire 1968 program payment to Gross. He agreed to this transfer, however, in exchange for Gross's transfer of eighteen additional acres on which Hanneman planted flax, and transfer of eighteen diverted acres to another part of Gross's farm. Hanneman then received two-thirds of the flax crop instead of the three-fifths earlier agreed to, and Gross cared for the diverted acres. Even though the flax crop did poorly (because the field had been treated with atrazine, a fact which Hanneman knew as well as Gross), Hanneman told Pelletier that "[h]e figured moneywise he probably came out about even because he did not have to take care of the diverted acres." Appendix at 215. We cannot conclude from this evidence that the district court erred in finding that Hanneman's agreement with Gross was not unfair, and thus, that ASCS inflicted further distress upon Gross in demanding a refund of the payment.

Hansen told Pelletier he agreed to lease 115 acres from Gross in 1968.[3] He planted 61.9 acres in corn, and diverted and cared for the remaining acres. Hansen wanted to split the crops sixty-forty, while Gross wanted to split the crops and the program payments fifty-fifty. They compromised by splitting the crops sixty-forty and the payments fifty-fifty. We cannot conclude that the district court erred in finding this a fair arrangement.

ASCS charged Gross with violating the regulations in relation to one other tenant, Swier, who agreed to lease 460 acres from Gross in 1970. Their lease provided that Gross would maintain the diverted acres and that they would share the crops fifty-fifty. Swier also wanted to lease a storage shed from Gross in order to store his ma-

---

**2.** The government contended at oral argument and in its brief at page 38, note 18, that Gross's actions also violated 7 C.F.R. § 794.2 which provides that any split of program payments between landlord and tenant in a different proportion than their agreed split of crops must be approved by the county committee.

There is testimony in the record which indicates that Gross secured such approval from ASCS officials on at least one occasion. See Appendix at 35. But whether Gross consistently received such approval when necessary is not at issue here, as the ASCS's November 23, 1971, letter demanded a refund only on the basis of his alleged violation of § 794.3. As we discuss infra, the fact that the ASCS proceeded against Gross for violating § 794.3 even though the Pelletier Report showed there was no basis for such action is sufficient evidence of continued intentional infliction of emotional distress.

**3.** Hansen would not sign his statement to Pelletier because he did not want to get involved in the investigation, but he read the statement and told Pelletier the contents were true and correct.

chinery. They orally agreed that Swier would pay Gross his price support payment as rent for the shed. Swier expected this payment to be $200 to $300, but in fact it turned out to be $1,751. Swier told Pelletier this amount surprised him, and that he argued with Gross that it was too much to pay for renting the shed. Nevertheless, he paid the full amount at Gross's insistence. Moreover, notwithstanding his dissatisfaction with the rental price, he signed a written lease with Gross for 1971 which provided for the same arrangement for renting the shed. The district court therefore concluded that if Swier signed a second lease, the arrangement must not have been unfairly required by Gross. Further, although Swier maintained that the shed's rental value for storing machinery was only about $300, Gross contended the shed's rental value was $2,500 if used to store corn. Gross's dealings with Swier raise the greatest doubt about whether Gross had violated the regulations. But even if the district court's finding is clearly erroneous as to Swier, the findings on Gross's agreements with Hanneman and Hansen are a sufficient basis for us to affirm the judgment below.

The ASCS knew Gross's dealings with Hanneman and Hansen were fair through the Pelletier Report. Nevertheless, the county committee proceeded to demand a refund of the 1968 program payments relating to the Hanneman and Hansen farms on November 23, 1971. At the hearing below, Carvel Johnson, the executive director for the county committee (and author of the November 23, 1971, letter) maintained that he never had access to the Pelletier Report. From this testimony, the government argues that the November 23, 1971, letter could not constitute intentional infliction of emotional distress on Gross. However, Johnson's letter began by citing the OIG investigation as the basis for determining Gross violated the landlord-tenant provision. The district court thus found Johnson's testimony on this point incredible, and

we are inclined to agree. But even if Johnson had not seen the Pelletier Report, his conduct on behalf of the county committee in demanding the refund of the Hanneman and Hansen payments clearly meets South Dakota's definition of intentional infliction of emotional distress. As an entity, the ASCS possessed information through the Pelletier Report from which a reasonable person would conclude that demanding these two refunds, given the historical context of ASCS's dealings with Gross, would be substantially certain to cause Gross further mental distress. We thus conclude the district court did not err in finding continued intentional tortious conduct by ASCS within the statute of limitations period.[4]

The district court awarded interest on the initial judgment from March 9, 1981, until the judgment is satisfied. The government argues that this award is prohibited by 28 U.S.C. § 2474 (1976), which states that the United States shall not be liable for interest prior to judgment, and similarly by 31 U.S.C. § 1304(b)(1) (1976). *See also* 28 U.S.C. § 2414 (1976 & Supp. 1981). Gross concedes the district court's award of interest was an error. We reverse the district court's judgment on this issue.

CONCLUSION:

For the reasons stated above, we affirm the district court's finding of continued tortious conduct by ASCS within the statute of limitations period. We reverse the district court's award of interest on the March 9, 1981, judgment. Gross's earlier judgment of $35,000 in damages is hereby affirmed.

---

4. Because we find that the November 23, 1971, demand for refund constitutes continued tortious conduct after August 7, 1971, it is unnecessary to review other ASCS actions (concern-

ing a corn storage loan and correspondence with the Department of Justice) which the district court found to be intentional tortious conduct within the statute of limitations period.