GROSETH INTERNATIONAL, INC. and
Clifford Groseth, Plaintiffs
and Appellees,

v.

TENNECO INC. and J.I. Case Co.,
Defendants and Appellants.

GROSETH INTERNATIONAL, INC.,
Plaintiff and Appellee,

v.

INTERNATIONAL HARVESTER CO.,
Defendant and Appellant.

Nos. 16206, 16207.

Supreme Court of South Dakota.

Argued Jan. 10, 1989.

Decided April 19, 1989.

Rehearing Denied May 15, 1989.

Steven M. Johnson, Celia Miner of Brady, Reade & Johnson, Yankton, for plaintiffs and appellees.

John Simko of Woods, Fuller, Shultz & Smith, Sioux Falls, for Intern. Harvester.

Maurice J. McSweeney, James L. Huston of Foley & Lardner, Milwaukee, Wis., for defendants and appellants.

HEEGE, Circuit Judge.

Previously, plaintiffs Groseth International, Inc. and Clifford Groseth appealed the entry of summary judgments against them. We determined that genuine issues of material fact existed and remanded the case for trial. *Groseth International, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D. 1987).

Following remand, defendants Tenneco Inc., J.I. Case Company, and International Harvester Company admitted liability at trial for violations of SDCL 37–5–3. A jury returned substantial compensatory and punitive damage verdicts for the violation of SDCL 37–5–3 and for defamation. Defendants appeal various issues from the trial and verdicts. Plaintiffs have also filed a notice of review. We affirm in part, reverse in part and remand for retrial of the damages issues under proper instructions consistent with this opinion.

## I. MEASURE OF DAMAGES FOR VIOLATION OF SDCL 37–5–3

At trial defendants admitted that they violated SDCL 37–5–3 * because of the manner in which they terminated the franchise contract of Groseth International, Inc. For violations of SDCL 37–5–3, SDCL 37–5–4 provides that: "Each and every person and corporation who or which violates any provision of §§ 37–5–1 to 37–5–3, inclusive, shall be liable to any dealer damaged thereby for all damages caused to such dealer by such violation." Defendants contend that the jury was improperly instructed on the measure of damages for violation of SDCL 37–5–3. We agree.

The trial court instructed the jury on the measure of damages, in part, as follows:

The amount of *gross profits,* if any, minus *direct* or *variable expenses,* lost in the past and are [sic] reasonably certain to be lost in the future as a proximate result of the termination of its Interna-

* In relevant part, SDCL 37–5–3 provides: "It is a Class 1 misdemeanor for any manufacturer, ... unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer in ... farm tractors, or farm implements."

tional Harvester dealership contract. You are not to award the costs of fixed future overhead costs which Groseth International can avoid by cutting costs or can apply to some other profitable use.

Groseth International concedes that the use of the term "gross profits" is a misnomer and should have been either "gross earnings," "gross receipts," or "gross sales." It is further conceded that the term "direct expenses" means "costs of goods sold" or "cost of merchandise sold," and the term "variable expenses" refers to the cost of sales such as commissions and salesmen salaries.

■ The instruction misstates the proper measure of damages. We concur with the parties that the proper measure of damages for loss of profits is set forth in *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715 (3d Cir.1971). From our interpretation of *Buono, supra,* the correct measure of damages, as it relates to this case, is: The amount of *net profits* (computed according to sound and accepted accounting principles) lost in the past and reasonably certain to be lost in the future as a proximate result of the termination of the franchise plus the amount of fixed future overhead expenses which plaintiff proves with reasonable certainty cannot be avoided by cutting costs or application to some other profitable use.

■ The court's instruction on damages permitted the jury to award an amount equal to the loss of "gross profits" as that term is traditionally used in accordance with sound and accepted accounting principles. Reversal of the jury's verdict is necessary, and we remand for a retrial of damages consistent with this opinion.

## II. ADMISSIBILITY OF EXHIBIT 100

At trial, Groseth International's expert witness prepared a compilation of sales, costs of sales (merchandise) and selling expense of sales to support the award of damages for loss of profits. By interpolating those figures, the expert estimated the earnings lost over a ten year period. These figures were summarized in Exhibit 100. It is apparent that the jury accepted these figures because the jury's award of compensatory damages matches the totals stated in Exhibit 100.

■ The admission of Exhibit 100 and its apparent use by the jury in calculating damages was error. The measure of damages used in Exhibit 100 is inconsistent with the previously explained correct measure of damages. On retrial Groseth International should present evidence of loss of net profits and not loss of earnings as set forth in Exhibit 100.

## III. REDUCTION OF FUTURE DAMAGES TO PRESENT VALUE

■ Defendants object that the jury was improperly instructed on reducing an award of future damages to present value. Based on the evidence received at trial, we believe the court correctly instructed the jury on the reduction of future damages to present value.

## IV. PUNITIVE DAMAGES FOR TERMINATION OF THE FRANCHISE

In its verdict, the jury awarded $1.6 million in punitive damages because of the defendants' actions in terminating Groseth International's franchise contract. We reverse the award of punitive damages and remand for retrial as limited by this decision.

■ Five factors bear upon the amount of punitive damages:
1. The amount allowed in compensatory damages;
2. The nature and enormity of the wrong;
3. The intent of the wrongdoer;
4. The wrongdoer's financial condition;
5. All of the circumstances attendant to the wrongdoer's actions.

*Wangen v. Knudson,* 428 N.W.2d 242, 246 (S.D.1988). Under the facts of this case, where we reverse the entire compensatory damage verdict, it is appropriate to reverse the punitive damages verdict. *Cf. Hulstein v. Meilman Food Industries,* 293 N.W.2d 889 (S.D.1980).

Defendants contend that punitive damages are unavailable in this case. They base their argument on the provisions of SDCL 21–1–4 and SDCL 37–5–4. SDCL 21–1–4 provides: "The general remedy by damages does not include exemplary or penal damages nor interest on any damages unless expressly provided by statute." The damages statute for violation of SDCL ch. 37–5, SDCL 37–5–4, makes no specific reference to punitive or exemplary damages. Thus it would follow that violation of SDCL 37–5–4 in and of itself could not give rise to an exemplary damage award.

■ Our analysis does not end by applying SDCL 21–1–4 to SDCL 37–5–4. We also examine whether the provisions of SDCL 21–3–2 apply to this case. The statute provides:

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed ... the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

Defendants concede that this case involves the breach of a statute and thus meets the statutory limitation of "breach of an obligation not arising from contact...." SDCL 21–3–2. On retrial, a jury may award punitive damages in its discretion if defendants have been guilty of oppression, fraud or malice, actual or presumed in connection with the termination of the dealership. This result is suggested in *Mid–America Marketing Corp. v. Dakota Industries, Inc.*, 289 N.W.2d 797 (S.D.1980). *See also, Kunkel v. United Security Ins. Co.* in which the court stated, "Conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability." 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969). *Cf. Hoffman v. Louis Dreyfus Corp.*, 435 N.W.2d 211 (S.D.1989); *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120 (S.D. 1977).

## V. DEFAMATION

The basis for plaintiff Groseth International's claim of defamation is a newspaper article which states in part:

Charles Schneider, a spokesman for Tenneco, Case's parent company, said: "It's a very detailed in-depth business evaluation. We're taking on John Deere; we can't afford to have a bad dealer out there."

In *Groseth I, supra,* we said:

Groseth claims that Case/Tenneco representatives stated to newspaper reporters that his business was not a good business and that "we can't afford to have a bad dealer out there." The implication was that Groseth was not a fit and proper dealer.... Whether or not the statements are defamatory raises a genuine issue of material fact precluding summary judgment.

410 N.W.2d at 172.

The evidence produced at trial does not support the claim that Case/Tenneco representatives stated to newspaper reporters that Groseth's business was not a good business, nor does it support the implication that Groseth was not a fit and proper dealer.

The correct procedure for determining the meaning and defamatory character of a communication is set forth in Restatement (Second) of Torts § 614 (1977) which provides:

(1) The court determines
    (a) whether a communication is capable of bearing a particular meaning, and
    (b) whether that meaning is defamatory.
(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

■ In this case, the statement that "we can't afford to have a bad dealer out there" is not capable of being and is not defamatory to Groseth and that issue should not have been submitted to the jury.

That part of the judgment awarding plaintiff actual and exemplary damages for defamation is reversed.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff Clifford Groseth filed a notice of review claiming that the trial court erroneously instructed the jury on the claim for intentional infliction of emotional distress. The trial court fashioned the instruction for intentional infliction of emotional distress from *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312 (1963), a case cited in *Groseth I,* 410 N.W.2d at 169. Upon review, we find that the elements of intentional infliction of emotional distress set forth in *Alsteen, supra,* are more restrictive than the elements cited by this court in decisions prior to and subsequent to *Groseth I, supra. Ruple v. Brooks,* 352 N.W.2d 652 (S.D.1984); *Ruane v. Murray,* 380 N.W.2d 362 (S.D.1986); *Wright v. Coca Cola Bottling Co.,* 414 N.W.2d 608 (S.D. 1987). Therefore, the trial court's instruction of intentional infliction of emotional distress was error.

■ As to intentional torts, this court has held,

[T]hat recovery can be had for mental pain, though no physical injury results, when the following elements are present: the act causing the anguish was done intentionally, the act was unreasonable, and the actor should have recognized it as likely to result in emotional distress. *Chisum v. Behrens,* 283 N.W.2d 235 (S.D.1979); *First National Bank of Jacksonville v. Bragdon,* 84 S.D. 89, 167 N.W.2d 381 (1969). *See also, Gross v. United States,* 723 F.2d 609 (8th Cir. 1983); *Gross v. United States,* 508 F.Supp. 1085 (D.S.D.1981). It has also been said of this tort that "there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." W. Prosser, Handbook of the Law of Torts § 12 (4th ed. 1971).

*Wright v. Coca Cola Bottling Co.,* 414 N.W.2d 608, 609 (S.D.1987); *quoting, Ru-*

*ple v. Brooks,* 352 N.W.2d 652, 654 (S.D. 1984). The evidence must show extreme emotional distress. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46, Comment j (1965). *See also, Bethards v. Shivvers, Inc.,* 355 N.W. 2d 39 (Iowa 1984).

A review of the evidence in this case indicates that the evidence was insufficient to make a jury issue of the intentional infliction of emotional distress claim. Therefore, the fact that the jury was erroneously instructed was not reversible error. We therefore affirm the determination that there was no intentional infliction of emotional distress.

## VII. TERMINATION OF TRUCK DEALERSHIP

■ Groseth International claims that the trial court erred in not permitting it to prove damages from the termination of its truck franchise. The propriety of terminating the truck dealership is the subject of another proceeding entitled, "In the Matter of the Termination of the Franchise Agreement Between Groseth International, Inc. and International Harvester," which is on appeal to this court. It is inappropriate to submit the issue of damages for termination of the truck dealership until such time as it is finally determined that the dealership was wrongfully terminated. The trial court's decision in that regard is affirmed.

## VIII. DAMAGES FOR DIMINUTION OF VALUE OF USED FARM EQUIPMENT

■ Groseth International claims that it was damaged by the diminution in the value of the used equipment which was the direct result of the termination of its agricultural equipment franchise. The trial court refused to instruct the jury that they could award damages for that diminution in value. On the retrial this issue should be submitted to the jury.

We affirm in part, reverse in part and remand this case to the trial court for

determination of damages in accordance with this opinion.

WUEST, C.J., and MORGAN and HENDERSON, JJ., concur.

SABERS, J., dissents.

HEEGE, Circuit Judge, for MILLER, J., disqualified.

SABERS, Justice (dissenting).

I dissent from the majority opinion on Issues I, II, IV, and V. The trial court properly instructed the jury on damages, properly admitted Exhibit 100, and properly permitted punitive damages for termination of the franchise and for defamation.

## I.

### Measure of damages for violation of SDCL 37–5–3.

SDCL 37–5–4 provides in part that "Each and every person and corporation who … violates any provision of §§ 37–5–1 to 37–5–3, … shall be liable to any dealer damaged thereby for all damages caused to such dealer by such violation."

The trial court defined damages as:

1. The amount of gross profits, if any, minus direct or variable expenses, lost in the past and are reasonably certain to be lost in the future as a proximate result of the termination of its International Harvester dealership contract. *You are not to award the costs of fixed future overhead costs which Groseth International can avoid by cutting costs or can apply to some other profitable use.*

You are to consider only those profits which Groseth International has proved by a preponderance of the evidence that it would have earned if it had retained the International Harvester line of farm equipment.

Your award of profits, if any, may not exceed the profits Groseth International would have earned from its International Harvester equipment dealership if it had not been terminated. (emphasis added).

The majority opinion claims "The instruction misstates the proper measure of damages" and asserts that

[T]he correct measure of damages, as it relates to this case, is: The amount of *net profits* (computed according to sound and accepted accounting principles) lost in the past and reasonably certain to be lost in the future as a proximate result of the termination of the franchise plus the amount of fixed future overhead expenses which plaintiff proves with reasonable certainty cannot be avoided by cutting costs or application to some other profitable use. (emphasis in original).

I respectfully submit that there is no real difference between the two instructions.

The majority relies on the statement that "Groseth International concedes that the use of the term 'gross profits' is a misnomer and should have been either 'gross earnings,' 'gross receipts,' or 'gross sales.'" It is obvious that even if "gross profits" is a misnomer it is less favorable to Groseth than "gross earnings," "gross receipts" or "gross sales." It certainly cannot be relied upon by Tenneco or the majority for reversal. Under the instructions suggested by the majority, the proper measure of damages is EQUAL to net profits (lost in the past and reasonably certain to be lost in the future), PLUS the amount of fixed overhead expenses unavoidable by cost cutting or application to other use. In short, the majority's measure of damages is equal to net profits plus unavoidable overhead.

The trial court instructed that the proper measure of damages EQUALS gross profits, if any, LESS direct or variable expenses:

Direct expenses were defined as cost of goods and merchandise;

Variable expenses were those eliminated because Groseth could no longer sell IH equipment, including all sales, salesmen's expenses, advertising, and salesmen's car expenses.

In addition, the trial court instructed the jury:

You are not to award the costs of fixed future overhead costs which Groseth International can avoid by cutting costs or can apply to some other profitable use.

You are to consider only those profits which Groseth International has proved by a preponderance of the evidence that it would have earned if it had retained the International Harvester Line of farm equipment.

Your award of profits, if any, may not exceed the profits Groseth International would have earned from its International Harvester equipment dealership if it had not been terminated.

In short, under the trial court's instruction, the measure of damages was gross profits less direct and variable expenses and avoidable fixed, overhead expenses. There is no substantial difference between the trial court instruction and the majority opinion instruction. Both instructions arrive at the proper measure of damages. The fact that the trial court instruction begins by describing gross profits as opposed to net profits is a distinction without a difference. There was no error, the error is the majority rushing to judgment of reversal.

## II.

### Admissibility of Exhibit 100.

The majority opinion's conclusion of error concerning the admission of Exhibit 100 hinges on its own mistake in Issue I concerning the measure of damages. It is established that no real difference or error existed. Therefore, the measure of damages used in Exhibit 100 is consistent with the correct measure of damages and the trial court properly admitted the same. Whether the items contained thereon were actually proven or sustained by Groseth were proper subjects for argument to and determination by the jury.

## IV.

### Punitive damages for termination of the franchise.

The sole reason given by the majority for reversing the jury award of $1,600,000 in punitive damages is "Under the facts of this case, where we reverse the entire compensatory damage verdict, it is appropriate to reverse the punitive damages verdict." Cf., *Hulstein v. Meilman Food Industries*,

293 N.W.2d 889 (S.D.1980). In other words, the reversal in this section is also dependent on the mistake made by the majority in Issue I concerning the measure of damages.

## V.

### Defamation.

In this section the majority opinion reverses the part of the judgment awarding plaintiff actual and exemplary damages for defamation because "the statement that 'we can't afford to have a bad dealer out there' is not capable of being and is not defamatory to Groseth and that issue should not have been submitted to the jury." I disagree.

SDCL 20–11–4 states in pertinent part: Slander is a false and unprivileged publication, other than libel, which: ...

(3) Tends directly to injure [a person] in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit; ...

"The law has always been very tender of the reputation of tradesmen, and therefore words spoken of them in the way of their trade will bear an action that will not be actionable in the case of another person." Prosser and Keeton, *The Law of Torts* § 112 at 790–91 (5th ed. 1984) (*Quoting Harman v. Delany*, 2 Strange 898, 93 Eng. Rptr. 925 (1731)).

On January 23, 1985, the Sioux Falls Argus Leader ran a story entitled "Hard times for farmers, businesses." In that article, six implement dealers in South Dakota were identified as those whose dealership contracts were cancelled as a result of the Case/Tenneco buyout of International Harvester. Among those dealers quoted in the article was Clifford Groseth.

Case and Tenneco officials contacted the Argus Leader on the following day and on January 24, 1985, the Argus Leader ran an

article entitled "J.I. Case defends implement decision." The article was placed on the identical page as the previous article.

The January 24, 1985, article contains the following statement:

Charles Schneider, a spokesman for Tenneco, Case's parent company, said: "It's a very detailed in-depth business evaluation. We're taking on John Deere; *we can't afford to have a bad dealer out there.*"

The contract cancellations are necessary because Tenneco does not want two Case/International Harvester dealerships competing in the same area, Schneider said. (emphasis added).

Groseth's brief points out that defendants objected to all parts of the article except the defamatory portion. Thus, the defamatory statement was, at defendants' request, out of context and the exhibit received by the jury. Thus, defendants waived any argument regarding context.

Schneider, an expert in public relations, recognized that the bad dealer comment was improper in that it left the impression that there was something wrong with the terminated dealers. The statement imputes a general disqualification to Groseth International and has a natural tendency to lessen its profit. SDCL 20–11–4.

Groseth's customers and farmers in general had no problem determining this statement was precise, definite, and unambiguous. As Chuck Tienken, a former Groseth employee, testified:

That news from that article, or whatever, came out, that news spread like wild fire. Everyplace you would go, everybody that would come in, would have comments about it. Many comments about "We didn't realize Cliff was in that bad of shape." "We didn't realize that someone considered this business that bad."

In contrast, the truth is that defendants can point to absolutely no evidence indicating that Groseth was anything other than an exemplary dealership.

Groseth was an XL dealer, a distinction reserved for only the finest International Harvester dealers. Schneider's statement was one of fact and not of opinion. Immediately before the defamatory statement, Schneider stated that the review process was a very detailed, in-depth business evaluation.

The majority opinion states:

The correct procedure for determining the meaning and defamatory character of a communication is set forth in *Restatement (Second) of Torts* § 614 (1977) which provides:

(1) The court determines

(a) whether a communication is capable of bearing a particular meaning, and

(b) whether that meaning is defamatory.

(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

Likewise, in *Bego v. Gordon*, 407 N.W.2d 801 (S.D.1987), we held concerning defamation: "Whether a tort was committed is a question of fact for the jury." *Id.* at 812.

In this case, the trial court properly submitted the question to the jury and the jury determined that the communication was capable of a defamatory meaning and was so understood by recipients, and Groseth's customers. This court is supposed to review the evidence in a light most favorable to the verdict. *Stoltz v. Stonecypher*, 336 N.W.2d 654 (S.D.1983). To do otherwise is to jump in the jury box and violate Groseth's constitutional right to a jury trial. We should review the evidence in the light most favorable to the verdict and affirm, not reverse, the verdict for Groseth.

In summary, we should affirm the verdict for compensatory damages in the amount of $1,312,000, punitive damages thereon in the amount of $1,600,000, defamation damages in the amount of $50,000, and punitive damages thereon in the amount of $200,000. We should do our duty and not violate Groseth's constitutional right to trial by jury.