Doris TIBKE, Tana Koch, and Misty Koch, Plaintiffs and Appellants,

v.

Don McDOUGALL, Tom Bennington, Joann Bennington, Scott Bolton, Dick Anderson, Patty Banwart, Pattye Flannagan, Leonard Remer, Trudie Besse, individually, and in their official capacity as officers or members of the Board of Directors of the West River Appaloosa Club and Sherry Bolton, Defendants and Appellees.

No. 17337.

Supreme Court of South Dakota.

Considered on Briefs May 20, 1991.

Decided Jan. 8, 1992.

Bruce H. Ellison, Rapid City, for plaintiffs and appellants.

Rexford A. Hagg of Whiting, Hagg & Hagg, Rapid City, for defendants and appellees.

BRADSHAW, Circuit Judge.

Doris Tibke (Tibke), Tana Koch (Tana), and Misty Koch (Misty) (collectively plaintiffs) take an intermediate appeal from a trial court order dismissing their cause of action for slander and Tibke's claim of intentional infliction of emotional distress against all defendants. They further appeal the order dismissing their lawsuits and granting partial summary judgment in favor of all defendants on plaintiffs' claims for tortious interference with business relations and expectancy except Tibke's claim against defendant Tom Bennington. We affirm.

## PROCEDURAL HISTORY AND FACTS

Tibke ran a family horse training business near Rapid City, South Dakota, from 1972 through the summer of 1985. This was conducted on her own ten acres of land complete with indoor and outdoor facilities for riding lessons, and training and boarding horses. Tana and Misty, Tibke's daughters, also participated in the family horse business. In the summer of 1985 Tibke sold her ten acre training facility and planned to move to Arizona. She changed her mind, however, and in the fall of 1985 purchased a mobile home in Piedmont, South Dakota. Subsequently, Tibke made an oral arrangement with Joe and Maxine Murdza where Tibke was allowed to board her horses at the Murdza ranch and continue training and giving lessons at the ranch. In return, the Murdzas were paid a portion of the profits. In approximately March of 1986 the arrangement between Tibke and Murdza was terminated. After losing the Murdza Ranch facilities, Tibke tried to get her horses into indoor training facilities at Hart Ranch and at the Gerald Tanner ranch, but no stalls were available.

Defendants are members of the West River Appaloosa Horse Club, Inc., (WRAC), which is a non-profit South Dakota corporation organized in 1969. Plaintiffs are suing all but one defendant individually and in their official capacity as officers or directors of the WRAC. WRAC is a local horse club which is affiliated with the national organization, Appaloosa Horse Club, Inc., (ApHC) located in Moscow, Idaho. WRAC is a voluntary organization and membership is a privilege. Article II, Section G of the WRAC Constitution states: "Those members abusing their privileges of membership shall have their membership revoked by the Board of Directors."

Tibke had been a member in good standing of WRAC for about fifteen years prior to December 1985. Her children were also members of the WRAC. In December 1985, following a November 22, 1985, gen-

eral meeting of the WRAC,[1] the WRAC Board of Directors terminated Tibke's membership on the grounds of her unsportsmanlike conduct and her continued disruptive behavior at meetings and horse shows. Defendants contend they were acting under the rights conferred upon them by the WRAC Constitution in revoking Tibke's membership. The Tibke–Murdza relationship was not terminated because of Tibke's loss of membership in the WRAC.

The Board of Directors determined that Tibke had abused her privileges of membership and that her conduct was detrimental to and not in the best interests of WRAC and the harmonious relationship of its members. Further, defendants contend that Tibke's unceasing disruptive behavior and her outstanding unpaid debt owed WRAC[2] were considered by the WRAC Board of Directors in deciding that Tibke would be denied the privilege of exhibiting horses in WRAC-sponsored shows, as an owner, trainer, or rider of any horse sought to be entered in any event. Tibke was informed in December 1985 that she could not renew her WRAC membership for 1986; however, Tibke was allowed to exhibit at WRAC shows despite her loss of membership. She was formally advised by a letter dated June 9, 1987, of the loss of exhibiting privileges until she paid her debt. Despite that letter and a subsequent phone call by Tom Bennington to Elaine Thomas informing her that Tibke could not show Elaine's horse at an upcoming show in Newcastle, Wyoming, Tibke still attempted to show Elaine's horse in Newcastle in June 1987 and was refused entry into

the show. Tibke filed a protest with ApHC over the denial of her entry. ApHC, upon a hearing, denied the protest.

In July 1986, Tibke was notified that she had been approved as a judge by ApHC. She lost her judging card as a result of her unprofessional behavior at an August 1986 horse show sponsored by WRAC.[3] Tibke's membership in ApHC was revoked in July 1988 and she was barred by the national club for life. ApHC proceedings are separate and distinct from the proceedings before us now. Neither WRAC nor ApHC is a named defendant in this lawsuit.

This is an intermediate appeal of the second of two lawsuits brought by Tibke against defendants. The first complaint dated December 19, 1986, alleged damages for Tibke's loss of reputation and business because of the loss of WRAC membership privileges and because of comments and observations made by various members of WRAC about Tibke's changing clothes in public at a July 1985 horse show, attempts to change club rules, unpopularity with members of WRAC, and her uncouth conduct and vulgar language. Plaintiffs claimed five causes of action: (1) tortious interference with business relations; (2) slander resulting in injury to profession, trade, or business; (3) slander; (4) intentional infliction of emotional distress to Tibke; and (5) infliction of emotional distress upon the Tibke children. This first complaint was dismissed for failure to state any claim upon which relief could be granted.

Plaintiffs served a second complaint[4] against the same defendants. This second

---

**1.** At the November 22, 1985, general membership meeting, the vote was unanimous not to renew Doris Tibke's 1986 membership.

**2.** The debt Tibke owed related to unpaid advertisements in the WRAC Directory.

**3.** Some of the disruptive behavior stated in the letters written by judges Mike Swain and Richard Bass to the ApHC included Tibke's skimpy attire, her attempt at intimidating people by holding up her rule book and making remarks like "they better not mess up or I'll protest the show," and her threat to stand in the middle of the stump race and not move if they did not let her son show.

**4.** Some of plaintiffs' allegations in their complaint include: defendants, without justification, terminated Tibke's membership in WRAC in 1985 and refused to renew it in 1986; defendants barred plaintiffs from WRAC-sponsored horse shows and events thereby knowing this would diminish the value of her horses and services; defendants began a campaign of malicious and false statements against Tibke which included that Tibke had "indecently exposed" herself at a horse show, that she was a "trouble maker" whom "we are going to get rid of," "her behavior was unbecoming of a professional trainer," Tibke "lies all the time," "[y]ou [Murdzas] should have white hair by now with all

complaint, the subject of this action, essentially repeated three of the same causes of action: (1) tortious interference with business relations or expectancy; (2) slander resulting in injury to profession, trade, or business; and (3) intentional infliction of emotional distress.

The trial court dismissed with prejudice the allegations of slander and intentional infliction of emotional distress for failure to state a cause of action against all defendants. But, the trial court found that plaintiffs had stated a cause of action for tortious interference with business relations.

Subsequent to the court's order, defendants moved for summary judgment based on Murdzas' affidavits that defendants had not interfered with any contract between Murdzas and Tibke. The trial court granted partial summary judgment in favor of defendants with regard to any tortious interference with Tibke's oral agreements with Murdzas and any relationships or damages resulting therefrom, but allowed plaintiffs additional time to identify with specificity any other contracts that may have been tortiously interfered with by defendants.

All of the defendants have testified by affidavit or stated in their answers to plaintiffs' interrogatories that they have never said or done anything intended to interfere with any business relations of the plaintiffs, nor have they ever discouraged or tried to dissuade anyone from using Tibke as a horse trainer.

After taking Tibke's deposition defendants filed a second motion for summary judgment on the claim of tortious interference with business relations. In support of Tibke's claim that defendants tortiously interfered with her business from approximately 1985 through 1989, Tibke named herself and eleven potential witnesses. All twelve filed affidavits, ostensibly in support of plaintiffs' claim.[5] After reviewing this new evidence, the court denied defendants' motion for summary judgment.

After deposing the twelve affiants,[6] defendants individually moved for summary

---

those expensive horses and that bitch of a trainer."

Plaintiffs further allege defendants made false and malicious comments to judges Mike Swain and Richard Bass at the August 1986 horse show which resulted in the suspension of Tibke's ApHC judging card. Tibke alleges that because of defendants' campaign against her she lost her place to raise, train, or board horses at the Murdza ranch which led to Tibke's breach of existing horse and rider training contracts and pending contracts together with the loss of facilities for her own horses. She alleged that all this directly injured her profession, trade, or business, and she suffered severe emotional distress including headaches, depression, lost sleep, hives, and medical bills.

5. The affidavits revealed that no actions or statements by any particular defendant could conceivably be material to a claim for tortious interference with business relations except the affidavits of Tibke and Elaine Thomas. Tibke's affidavit recounts hearsay evidence of defendant Tom Bennington's phone call to John and Elaine Thomas prior to the 1987 horse show at Newcastle, Wyoming.

Elaine Thomas' affidavit identified defendant Trudie Besse as having acted at the direction of the WRAC Board of Directors to bar Tibke from participating while at the 1987 Newcastle horse show. Elaine also identified Tom Bennington as having made the phone call shortly before the 1987 Newcastle show advising her of the fact that Tibke would not be allowed to ride/show at the 1987 Newcastle show.

6. A summary of their depositions follows.

Tibke stated her loss of facilities, being kicked out of WRAC, along with the hard feelings brought on by this lawsuit were the reasons she lost most of her clients. She further stated that practically all agreements with her clients were oral. Tibke also recounts Tom Bennington's phone call to Elaine and John Thomas about not allowing the Thomases to show at the 1987 Newcastle horse show if they used Tibke as their rider. See Elaine and John Thomas' deposition below.

Richard Rebbeck did not identify any defendant nor did he identify any interference in any business relations he might have had with any plaintiff resulting from any defendants' actions. Darlene Jensen identified her business relations with Tibke as having been unrelated to Appaloosa horses. She attended one of Tibke's training clinics with a paint stallion and hired Tibke to work with her quarter horse in 1987. She began using Tibke after Tibke's membership was terminated with WRAC and after this litigation was initiated. Jensen said she never had any direct conversations with any defendant and she stated she would still use Tibke today to train for her if she had another pleasure horse, but she does not. Jensen could not establish any interference by any defendant in any business relation she may have had with any plaintiff.

judgment. On July 31, 1990, the trial court granted partial summary judgment on the claim of tortious interference with business relations in favor of all defendants except Tom Bennington because a phone call he made may have affected an alleged agreement between Tibke and John and Elaine Thomas. Furthermore, the court dismissed, with prejudice, all claims by Misty and Tana against all defendants. Plaintiffs raise four issues on appeal.

## STATEMENT OF LEGAL ISSUES

I. DID THE TRIAL COURT ERR IN ITS ORDER DISMISSING PLAINTIFFS' CAUSE OF ACTION FOR SLANDER AGAINST ALL DEFENDANTS?

II. DID THE TRIAL COURT ERR IN ITS ORDER DISMISSING PLAINTIFF TIBKE'S CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS?

III. DID THE TRIAL COURT ERR IN ITS ORDER GRANTING SUMMARY JUDGMENT FOR ALL NAMED DEFENDANTS EXCEPT TOM BENNINGTON AS TO TIBKE'S CLAIM OF TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS?

IV. DID THE TRIAL COURT ERR IN ITS ORDER DISMISSING THE LAWSUITS BROUGHT BY PLAINTIFFS TANA AND MISTY?

## STANDARD OF REVIEW

■ The South Dakota Rules of Civil Procedure state that if, on a motion to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in SDCL 15–6–56.[7]

The settled record before us plainly indicates that matters outside the pleadings were presented to and considered by the trial court before the orders to dismiss

Patty Brunner stated she could not identify any attempt by any defendant to stop her business relations with Tibke. She is not blaming any party for her decision to discontinue using Tibke as a trainer.

Nancy Nelson stated that her reasons for no longer using Tibke as a trainer were due to Nelson not having any new horses to be trained, the expense of training, and Tibke's inadequate facilities. She did not identify any action by any defendant that in any way affected any business relations she might have had with any plaintiff.

Kristin (Sager) Lyons stated that she used Tibke for horse training only once and did not have any need to use her again. None of the defendants had anything to do with her decision regarding any business relations with plaintiffs.

Wayne Bratcher stated he had used a trainer only two or three times ever. He used Tibke once for a special problem and never "quit" using Tibke. No defendant said anything to Bratcher that would cause him to change any business relations with Tibke.

Elaine and John Thomas explained that they had not shown any horses in 1986 and only one horse in 1985. The Thomases had practically stopped showing horses after 1984 and only continued again in 1987 when they found out they needed only a few more points on their horse, Comanche Eagle, for its fifth Register of Merit which would make the horse a National Versatility Champion. Tibke trained Comanche Eagle for approximately six weeks prior to the 1987 Newcastle, Wyoming horse show, when Tom Bennington called the Thomases the night before they were planning on leaving for Newcastle and explained to the Thomases that they could not show their horse if Tibke was going to ride/show for them at Newcastle. There was no written contract between Tibke and Thomases regarding training or showing Comanche Eagle or any other horses the Thomases owned at the time. John Thomas knew prior to the Newcastle show that Tibke was not going to be allowed to ride/show for them and that Comanche Eagle could have been ridden/shown by someone other than Tibke at that show.

Betty Gerke stated that she had used Tibke along with at least three other trainers for the reason that "the more people you go to, the more you learn" and "you learn something different from everyone." She has not changed business relations with Tibke and she would use her today if she thought Tibke's service would be of help. She recalled name calling on both sides but could not cite anything any individual defendant ever said about Tibke.

Roy Yates stated he was out of the state from 1983 through April of 1989 and had no personal knowledge of any problems between Tibke and defendants. To his knowledge, none of the defendants ever tried to dissuade him or anyone else from doing business with Tibke. He has not altered any business relations with Tibke.

7. SDCL 15–6–12(b).

were entered against plaintiffs.[8] Accordingly, on review we treat defendants' motions to dismiss as motions for summary judgment and the disposition a grant of those motions. *Glanzer v. St. Joseph Indian School*, 438 N.W.2d 204, 206 (S.D.1989).

This court reviews summary judgments under the premise that affirmance of such a judgment is proper if there are no genuine issues of material fact and there exists any basis which would support the trial court's ruling. *Production Credit Assn. of the Midlands v. Mary Wynne, et al.*, 474 N.W.2d 735 (S.D.1991); *Trammell v. Prairie States Ins. Co.*, 473 N.W.2d 460 (S.D.1991); *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221 (S.D.1988).

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c),[9] the evidence must be viewed most favorably to the non-moving party; the movant has the burden of proof to clearly show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; summary judgment is not a substitute for trial; a belief that the non-moving party will not prevail at trial is not an appropriate basis for granting the motion on issues not shown to be sham, frivolous, or unsubstantiated; summary judgment is an extreme remedy and should be awarded only when the truth is clear and reasonable doubts touching upon the existence of a genuine issue of material fact should be resolved against the movant. *Pickering v. Pickering*, 434 N.W.2d 758 (S.D.1989); *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 157 N.W.2d 19 (1969). Where, however, no genuine issue of fact exists it is looked upon with favor and is particularly adaptable to expose sham claims and defenses. *Ruane v. Murray*, 380 N.W.2d 362 (S.D.1986).

In addition to the foregoing tenets pertaining to summary judgments, the formal issues presented by the pleadings are not controlling and a party may not rest upon the mere allegations contained therein; the party opposing a motion for summary judgment must be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment; *Breen v. Dakota Gear & Joint Co., Inc., supra;* and the non-moving party must present specific facts which demonstrate there is a genuine, material issue for trial. *Ruane v. Murray, supra;* SDCL 15–6–56(e). With these considerations in mind, we address the merits of Tibke's appeal in chronological order.

## DECISION

**I. THE TRIAL COURT DID NOT ERR IN DISMISSING PLAINTIFFS' CAUSE OF ACTION FOR SLANDER AGAINST ALL OF THE DEFENDANTS.**

Plaintiffs' complaint alleges slander resulting in injury to profession, trade, or business. Defendants' answer denies the claim and asserts a conditional privilege.

To state a claim for slander, a plaintiff must establish that the publication was both false and unprivileged. SDCL 20–11–4 states in pertinent part:

Slander is a false and unprivileged publication other than libel, which:

\* \* \* \* \* \*

(3) Tends directly to injure [plaintiff] in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business

---

**8.** The trial court reviewed the prior complaint, the present complaint, supporting and opposing briefs filed, together with the record, and the case law before dismissing plaintiffs' allegations of slander and intentional infliction of emotional distress against all defendants.

**9.** SDCL 15–6–56(c) reads in part:

The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

that has a natural tendency to lessen its profit;

SDCL 20–11–5 reads, in pertinent part:

A privileged communication is one made:

(1) In the proper discharge of an official duty;

\* \* \* \* \* \*

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

\* \* \* \* \* \*

In the cases provided for in subdivision (3) ... of this section, malice is not inferred from the communication or publication.

Restatement (Second) of Torts § 596 discusses the privilege of common interest to be:

An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

This defense extends to non-profit organizations like WRAC.

The common interest of members of religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated, is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society. This is true whether the defamatory matter relates to alleged misconduct of some other member which makes him undesirable for continued membership, or the conduct of a prospective member.

Restatement (Second) of Torts § 596, comment (e).

In order to be conditionally privileged, a communication must be without malice. If malice exists, the actions exceed the privilege or constitute an abuse thereof. *Bego v. Gordon*, 407 N.W.2d 801 (S.D.1987).

The record shows that all of the alleged slanderous communications made by the various defendants were made to other members of WRAC or to other interested people in the horse business. We find that the communications were among interested parties and therefore conditionally privileged.

■ Next, we determine whether the communications were made with malice which would negate the conditional privilege. A "qualified or conditional privilege may be lost when the speaker, on an otherwise privileged occasion, publishes false and defamatory matter concerning another which either (a) he in fact does not believe to be true or (b) has no reasonable grounds for believing it to be true." *Bego v. Gordon, supra,* 407 N.W.2d at 811. It appears from the record that defendants' comments concerning Tibke were true. Certainly, defendants believed them to be true or had reasonable grounds for believing them to be true. Therefore, the conditional privilege was not negated. Plaintiffs' complaint does set out general allegations of malice in an attempt to defeat defendants' conditional privilege. However, a specific showing of malice is required for purposes of raising a genuine issue of a material fact, and this burden was not met by the complaint, depositions, or affidavits. *Uken v. Sloat*, 296 N.W.2d 540 (S.D.1980) (citing *Hughes–Johnson Co. v. Dakota Midland Hospital*, 86 S.D. 361, 195 N.W.2d 519 (1972)); *see also* SDCL 15–6–56(e).[10] Be-

---

10. SDCL 15–6–56(e) in pertinent part states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated there-in." Furthermore, "[w]hen a motion for summary judgment is made and supported as provided in § 15–6–56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in § 15–6–56, must set forth

cause malice cannot be presumed, the party bearing the burden of proof must establish that there was a reckless disregard for the truth on the part of the accused. *Uken v. Sloat, supra*, (citing *Wollman v. Graff*, 287 N.W.2d 104 (S.D.1979)). "The real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether he 'in fact entertained serious doubts as to the truth of his publications.' " *Id.* at 543. Plaintiffs have failed to allege both falsity and lack of privilege in their complaint, and they have not set forth specific facts through competent evidence by affidavit, deposition or otherwise pursuant to SDCL 15–6–56(e) to support their general allegations of malice and falsity in defense of defendants' motion to dismiss. We therefore hold that defendants' communications were between interested parties and therefore privileged, and made without malice. We affirm the trial court's order to dismiss all counts of slander against all defendants.

## II. THE TRIAL COURT DID NOT ERR IN DISMISSING PLAINTIFF TIBKE'S CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS.

Tibke argues that the trial court erred in granting defendants' motion to dismiss her claim for intentional infliction of emotional distress.

In *First National Bank of Jacksonville v. Bragdon*, 84 S.D. 89, 167 N.W.2d 381 (1969), this court recognized the tort of intentional infliction of emotional distress. The *Bragdon* court held the important elements of that tort to be, "that the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness [emotional distress]." *Chisum v. Behrens*, 283 N.W.2d 235 (S.D. 1979); *Ruple v. Brooks*, 352 N.W.2d 652 (S.D.1984); *Ruane v. Murray, supra;* and *Groseth Intern., Inc. v. Tenneco Inc.*, 440 N.W.2d 276 (S.D.1989) (*Groseth II*).[11]

In essence, the *Ruple, Ruane,* and *Groseth II* rule is broader than the rule set forth in Restatement (Second) Torts § 46(1), which provides: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The court in *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 169 (S.D. 1987) (*Groseth I*) (citing *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963)), determined the proper criteria for establishing a prima facie case for intentional infliction of emotional distress to be: (1) an act by defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.[12] *Mackintosh v. Carter*, 451 N.W.2d 285 (S.D.1990). Even though this standard of liability is more restrictive than the rule set out in *Ruple, Ruane,* and *Groseth II*, we feel this standard is more reflective of societal discourse today.[13]

specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

11. "As to intentional torts, this court has held, [t]hat recovery can be had for mental pain, though no physical injury results, when the following elements are present: the act causing the anguish was done intentionally, the act was unreasonable, and the actor should have recognized it as likely to result in emotional distress." *Groseth II, supra* at 280.

12. The court in *Alsteen* modified § 46(1) of Restatement (Second) of Torts by omitting "... or recklessly ..." The court determined that the term "intentional" implies that the defendant's course of conduct was undertaken purposefully for imposing psychological harm whereas the term "recklessly" if used in the rule would impose liability upon a defendant who is not purposely attempting to impose psychological harm.

13. "Regrettably, standards of speech and social discourse have become so debased that that which once was heard only in the locker room and in the barracks has become commonplace—if indeed not *de regueur* in certain circles. Speech that we judges find to be grossly

The requirement that the conduct be extreme and outrageous reflects our concern with the difficulties surrounding proof of the existence of severe emotional harm, and proof of a causal relationship between the injury and the defendant's conduct. If the conduct is gross and extreme it is more probable that the plaintiff did, in fact, suffer the emotional distress alleged. Moreover, the requirement of extreme and outrageous conduct as a condition of recovery will avoid litigation "in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than law."

*Alsteen, supra,* 124 N.W.2d at 318.

In addition to setting forth the elements of the tort of intentional infliction of emotional distress, this court has repeatedly held that "[t]his tort requires conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." *Groseth I, supra,* 410 N.W.2d at 169; *Ruple v. Brooks, supra; Ruane v. Murray, supra; Wright v. Coca Cola Bottling Co.,* 414 N.W.2d 608 (S.D.1987); W. Prosser, *Handbook of the Law of Torts* § 12 (4th ed. 1971).

We have vacillated in our prior opinions setting forth the elements of this tort. The bench and bar of this state are entitled to a definitive delineation of the elements of the tort of intentional infliction of emotional distress. Therefore, it is established that we adhere to the tenets of *Groseth I* and *Mackintosh v. Carter, supra,* as to the elements necessary for a plaintiff to establish a prima facie case of intentional infliction of emotional distress.

For conduct to be "outrageous," it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Restatement (Second) of Torts § 46 comment (d). The determination of outrageous conduct by the defendant is initially for the court.[14]

 In this case, we are of the opinion that reasonable men would not differ in finding that defendants' termination and nonrenewal of plaintiff's membership in WRAC together with the various statements allegedly made by defendants do not amount to extreme and outrageous conduct. Furthermore, plaintiffs' supporting affidavits in defense to defendants' motion to dismiss do not set forth specific facts showing that there is a genuine issue for trial. We therefore affirm the trial court's decision to dismiss Tibke's claim of intentional infliction of emotional distress against all defendants.

## III. THE TRIAL COURT DID NOT ERR IN GRANTING PARTIAL SUMMARY JUDGMENT TO ALL THE DEFENDANTS EXCEPT TOM BENNINGTON ON THE ISSUE OF TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND EXPECTANCY.

Tibke alleges a series of tortious interferences with business relations by the defendants that resulted in her loss of facilities to raise, train, or board horses causing a breach of existing contracts or prospective business. Tibke further alleges the barring of her from WRAC sponsored shows resulted in her inability to show her horses or her client's horses which diminished the horses value for sale and breeding. She also contends that her termination in 1985 and continuing nonrenewal

---

offensive may seem less than outrageous to a jury composed of individuals daily exposed to the suffocating verbal crudities epidemic in a society in which so many have apparently lost the ability to express themselves in other than the most graphic of terms." Justice Wollman's dissenting opinion in *Ruple, supra,* 352 N.W.2d at 658.

**14.** Comment (h) to Restatement (Second) of Torts § 46 provides:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine, whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

of her membership in WRAC along with her loss of her ApHC judging card and permanent expulsion from ApHC were all caused by defendants' tortious campaign against her to ruin her horse business.

■ First, any allegations by Tibke relating to her loss of membership/nonrenewal in WRAC, any barring from WRAC sponsored shows, loss of her ApHC judging card, or her permanent expulsion from ApHC per se are not a proper subject for review by this court. If there were any improprieties committed by defendants, any ApHC judges, or ApHC relating to the above charges, the proper procedure for redress would be for the plaintiff to exhaust her administrative remedies within the organization before appealing to the courts. Annotation, *Suspension or expulsion from social club or similar society and the remedies thereof*, 20 A.L.R.2d 344, 384 (1951). This would include appealing her grievances to the Disciplinary Committee, the Board of Directors or the Appeals Committee of ApHC.[15]

This court has recognized a cause of action for intentional and wrongful interference with contractual relations. However, the interference must have been intentional and without reasonable justification or excuse. *Lien v. Northwestern Engineering Co.*, 73 S.D. 84, 39 N.W.2d 483, 485 (1949). In *Groseth I, supra*, at 172, we held that "[t]he tort of intentional interference with a business relationship requires only that there is an intentional interference with the business relationship which

results in damage to the plaintiff to establish a prima facie case." Citing Prosser, *Law of Torts*, § 130 at 953 (1971); *Mitchell Machinery, Inc. v. Ford New Holland, Inc.*, 918 F.2d 1366, 1371 (8th Cir.1990). We have further held that "the interference may consist of injury to either an existing contractual relation or a prospective contractual relation." *Groseth I, supra*, (citing Restatement (Second) of Torts § 766B (1979)).[16] *See also Nesler v. Fisher and Co., Inc.*, 452 N.W.2d 191 (Iowa 1990).

■ Both parties to this lawsuit concede, and we now adopt the principle, that the essential elements of a claim of tortious interference with business relationships or expectancy, which the plaintiff must prove to recover, consist of: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982). *See also, Nesler v. Fisher and Co., Inc., supra*, 452 N.W.2d at 198–99; 45 Am.Jur.2d *Interference* § 50 (1969); Annotation, *Liability for interference with at will business relationship*, 5 A.L.R.4th 9 (1981). These elements help clarify the existing law stated previously in South Dakota and more closely follow Restatement (Second) of Torts §§ 766 [17] and 766B.

---

15. Because the Constitution, Articles of Incorporation, and By-laws of WRAC are so incomplete for appealing local decisions and the fact that WRAC is a regional club which is affiliated with the ApHC it is only proper that when local rules are silent on procedure, one must look towards the Official Handbook provided by ApHC. A person must first be a member in good standing with ApHC before becoming a member in a regional club affiliated with ApHC. If Tibke was not given proper notice and a hearing before her expulsion from WRAC then her proper procedure would be to appeal to ApHC before complaining to the court system. This would also include the defendants' barring of Tibke from horse shows, loss of her ApHC judge's card, and loss of her membership in ApHC.

16. Restatement (Second) of Torts § 766B provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

17. Restatement (Second) of Torts § 766 provides:

One who intentionally and improperly interferes with the performance of a contract (ex-

There has been no showing of a contract or business relationship between Tibke and anyone other than with the Murdzas and the Thomases. The trial court gave Tibke an opportunity to identify with specificity any other contracts that may have been tortiously interfered with by defendants. Plaintiffs failed to do so. As clearly shown by the affidavits of the Murdzas and un-contradicted by plaintiffs, the termination of the arrangement for Tibke's training facilities at the Murdza ranch was caused by insurance costs and plaintiff's abuse of the arrangement, rather than by Tibke's loss of membership in WRAC or ApHC or any tortious interference by any of the defendants. Moreover, there is absolutely no showing of any comments or conduct by defendants to other people which would raise to the level of tortious interference with a business relationship. (*See* footnote 6, relating to the depositions of Tibke's witnesses.)

■ All other allegations, even when viewed in the light most favorable to Tibke, reveal that the only relationship in which there was any type of conduct that could present a genuine issue of a material fact for trial on the issue of tortious interference with a business relationship would have been plaintiff's arrangement with John and Elaine Thomas, which concerned only defendant Tom Bennington. This arrangement had to do with the June 1987 show in Newcastle, Wyoming. Tibke and Thomases had an agreement whereby Tibke took one of Thomas' horses some five or six weeks in advance to get the horse in show quality. Tom Bennington, one of the defendants, had called the Thomases before the show and told them they could not show if Tibke was going to show their horse. The facts are disputed as to whether Tom Bennington did in fact interfere with existing business relations and whether that interference extended to any prospective business relations between the plaintiff and the Thomases resulting in the claim against Tom Bennington being ex-

cept a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for

cluded from the trial court's order granting summary judgment. We therefore affirm the trial court's order granting summary judgment for all named defendants except Tom Bennington on the claim of tortious interference with business relationships or expectancy.

## IV. THE TRIAL COURT DID NOT ERR IN DISMISSING THE LAWSUITS BY TANA AND MISTY.

■ There is only one remaining issue in this appeal and that relates to the possible involvement or participation of Tana and Misty regarding the June 1987 Newcastle, Wyoming show and the arrangement between Tibke and John and Elaine Thomas. Liability for tortious interference with a business relationship can be asserted only by those directly connected with the contract or relationship on which the alleged tortious interference was immediately operative. 45 Am.Jur.2d *Interference* § 53. After reviewing all the evidence, neither Tana nor Misty were ever involved with the arrangement between Tibke and Thomases regarding the June 1987 Newcastle, Wyoming horse show or any subsequent shows with Thomases. We therefore affirm the trial court's order dismissing the lawsuits brought by Misty and Tana.

MILLER, C.J., and WUEST, and AMUNDSON, JJ., concur.

SABERS, J., dissents.

BRADSHAW, Circuit Judge, for HENDERSON, J., disqualified.

SABERS, Justice (dissenting).

Summary judgment was improper because a genuine issue of material fact exists as to Defendants' conduct and comments precipitating Tibke's loss of membership in both WRAC and ApHC. The burden is upon the Defendants, as moving party, to clearly show that when the evi-

the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

dence is viewed most favorably to Tibke, no genuine issue of material fact exists. *Weiszhaar Farms v. Live Stock State Bank,* 467 N.W.2d 752, 754 (S.D.1991); *Klatt v. Continental Ins. Co.,* 409 N.W.2d 366, 368 (S.D.1987). They failed to sustain their burden. *State, Dept. of Revenue v. Thiewes,* 448 N.W.2d 1, 3 (S.D.1989).

The majority opinion sets out the five-part test for tortious interference with a business relationship or *expectancy.* It then ignores portions of this test. Even if Tibke made no showing of any contract or business relationship, the record is replete with expectancies. (See, e.g., Affidavit of Elaine Thomas, SR 794, wherein she stated: "[W]e have therefore not been able to continue our practice of hiring Doris Tibke to show our horse. As far as we are concerned, the WRAC board is solely responsible for the inability for us to continue what had been a wonderful and continuous working relationship."). Additionally, Tibke provided evidence that the value of her own horses, also a business expectancy, dropped due to her inability to show them. (See Affidavit of Roy Yates, SR 786).

Viewing the evidence most favorably to Tibke, genuine issues of material fact exist as to whether Defendants intentionally interfered with Tibke's business expectancies by causing her loss of WRAC and ApHC membership. Therefore, summary judgment was improper. *Groseth Intern., Inc. v. Tenneco, Inc.,* 410 N.W.2d 159, 172 (S.D. 1987). I would reverse and remand for a trial.