2000 SD 67

**John GILCHRIST, Plaintiff and Appellant,**

v.

**TRAIL KING INDUSTRIES, INC., and Rehabilitation Strategies, Inc., Defendants and Appellees.**

**No. 20782.**

Supreme Court of South Dakota.

Considered on Briefs June 1, 1999.

Decided May 24, 2000.

---

**12**

Rick Johnson of Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, J.M. Grossenburg, Winner, for plaintiff and appellant.

Susan Jansa Brunick of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee Trail King.

Lisa Hansen Marso and Gary J. Pashby of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellee Rehabilitation Strategies.

KONENKAMP, Justice

[¶ 1.] John Gilchrist appeals summary judgment in favor of defendant Rehabilitation Strategies, Inc. We affirm.

**Facts**

[¶ 2.] Gilchrist was an employee of Trail King Industries, Inc. On September 1, 1994, while working in the scope of his employment, he slipped and fell off a platform. As he fell, a ring on his right "pinkie" finger caught on a bracket, mo-mentarily suspending his fall and injuring him. He was treated that day by Dr. M.J. Christensen and sent home. He complained of injuries to his finger, neck, shoulder, rotator cuff, hands, back, and internal organs.

[¶ 3.] After the initial appointment, Dr. Christensen referred Gilchrist to Dr. Edward Adams, an orthopedic surgeon, who in turn, sent him to Dr. Myung Cho, a physiatrist. Doctors P.H. Rasmussen and Dennis Leland, among others, also treated him for various medical problems. Although he was consulting other doctors, Dr. Cho considered herself Gilchrist's treating physician for his work–related injury.

[¶ 4.] Trail King, a self-insured employer, began paying workers' compensation benefits to Gilchrist, including medical expenses. After he participated in physical therapy for eight weeks, Trail King hired Rehabilitation Strategies, Inc. (RSI) to oversee his rehabilitation program. RSI's employee, Kathy Burns, was assigned to his case. Burns sent him a letter on November 4, 1994 introducing herself, and stating that she would work with him, his employer, his physicians, and others "to assist [him] in returning to work." When they first met on November 7, Burns told him that she was hired to get him "squared away." She began attending his doctor appointments with him and discussed his return to work with Trail King. Burns later explained that it was her policy "to keep [Trail King] informed as to when Mr. Gilchrist was able to go to work and what his medical status was."

[¶ 5.] On December 5, 1994, Dr. Cho saw Gilchrist. Burns was also there, and the three discussed the topic of Gilchrist's return to work. Based on the progress he was making in physical therapy, Dr. Cho issued a release to work on light duty, four hours per day. Dr. Cho was not aware, however, that he was vomiting blood and was bleeding from his rectum, as he did not report these problems to her. Accord-

ing to Dr. Cho, she had requested Burns to give her Gilchrist's other medical records to review, but she did not receive them. Burns had access to those records and knew of Gilchrist's ongoing medical problems, but did not mention these other conditions to Dr. Cho.

[¶ 6.] On December 13, 1994, Gilchrist went to Trail King and reported that he was still too ill to work. Norman Tarbell, Trail King's workers' compensation coordinator, told him to come back the next day and together they would call any physician Gilchrist requested to discuss his medical condition. Gilchrist did not return. On December 14, Trail King sent Gilchrist a certified letter informing him that because Dr. Cho had authorized a release, he was to report to work within forty-eight hours of the receipt of the letter or he would be terminated.[1] Trail King then arranged for Gilchrist to see Dr. David Hoversten for an independent medical evaluation. Also on December 14, Gilchrist saw doctors Leland and Christensen and both authorized no work.[2] Burns knew that Dr. Adams also had questions regarding a work release because Burns faxed Tarbell a note on December 20 stating "Doctor Adams questions jobs per phone." Gilchrist's final work release was also to be approved by Dr. Christensen. Burns admitted that she "had no communication whatsoever with Dr. Christensen." She explained that this was because "[h]e was not actively involved with the injuries that were related to Mr. Gilchrist's case at that time."

[¶ 7.] Gilchrist saw Dr. Hoversten on December 22. Dr. Hoversten found that Gilchrist suffered a rotator cuff injury and had carpal tunnel syndrome in both hands. He recommended that surgery be performed at the same time to repair both the rotator cuff injury and the carpal tunnel syndrome in the right hand. He later testified that it would have been good practice to do the surgeries simultaneously, but performing them together was not medically necessary. The surgery was scheduled for February 4, 1995.

[¶ 8.] Burns, as the coordinator for Gilchrist's health care, was also in contact with his other doctors and the representatives of Risk Administration, the third party administrator for Trail King. Risk Administration asked Dr. Cho to evaluate the extent of Gilchrist's work-related injuries. By letter dated January 25, Dr. Cho explained that Gilchrist's right shoulder injury and injury to his right hand were the result of his fall at work; however, the rest of his injuries were not caused by the accident.

[¶ 9.] On January 30, Gilchrist saw Dr. Cho again, accompanied by a representative of RSI. At this appointment, Gilchrist was still reporting internal bleeding, which was being treated by Dr. Christensen. Gilchrist expressed confusion to Dr. Cho about whether he was able to return to work with his ongoing medical problems. Dr. Cho believed that Trail King was willing to have him come back to work. She wrote another work release returning him to the same light duty she had authorized previously, provided Dr. Christensen approved the release.[3] Dr. Cho's treatment

---

1. Trail King eventually terminated his employment, but the parties disagree on when it was effective. Gilchrist claims he was fired on December 14, 1994. RSI, however, states that Trail King "considered Gilchrist to have voluntarily quit" on February 14, 1995. Burns testified in her deposition that on January 30, 1995, she contacted Trail King and it claimed it still "had a job" for Gilchrist. Trail King claims that Gilchrist signed for the certified letter on December 21, but it did not accept Gilchrist's "voluntary resignation" until February 1995, after numerous attempts to

contact him by phone, mail, through counsel, and in person.

2. Trail King claims it never received copies of these notes.

3. Dr. Cho's work release underwent a series of modifications. She first issued a release in early December. There were questions from Dr. Adams about Gilchrist running a forklift, so he did not initially approve the work release. Dr. Cho later added a restriction to her original work release that Gilchrist not

notes also reflect that she discussed the need for Dr. Christensen's prior approval with RSI's representative. RSI assured Dr. Cho that Dr. Christensen would be contacted. No release was ever sought from Dr. Christensen, apparently.

[¶ 10.] After RSI received Dr. Cho's letter on the unrelatedness of Gilchrist's carpal tunnel syndrome to his workers' compensation injury, it recommended to Trail King that it not accept responsibility for the cost of the carpal tunnel surgery. When Dr. Hoversten received this news he notified Gilchrist. Gilchrist later said he could not go through with surgery because workers' compensation was "jerking him around," and he did not have the money to pay for the uncovered portion of the surgery.[4] He cancelled the entire procedure.

[¶ 11.] Gilchrist filed a workers' compensation action. He also brought this suit on March 16, 1995 against both Trail King and RSI alleging bad faith, intentional infliction of emotional distress, and wrongful termination. In October 1995, the circuit court ordered a stay of the bad faith cause of action, "pending the exhaustion of administrative remedies, except as it may relate to the remaining causes of action."

[¶ 12.] The Department of Labor issued a decision on workers' compensation benefits in December 1997. It ruled that Gilchrist was entitled to rotator cuff and carpal tunnel surgery on his right hand, but that his claimed total disability from severe depression was not caused by the work injury. Gilchrist appealed in February 1998. Based on the Department's decision, RSI and Trail King moved for summary judgment. At the hearing, Gilchrist urged the trial court to postpone its decision on summary judgment until after the ruling on Gilchrist's appeal from the Department's decision. The court declined to wait, granted summary judgment to RSI on all Gilchrist's claims, and denied Trail King's summary judgment motion. The court also granted RSI certification under SDCL 15-6-54(b). In the meantime, the circuit court presiding in the workers' compensation appeal reversed the Department's decision on Gilchrist's psychological disability claim and found it to be work related and compensable. Thereafter, the Department ruled that the "depression that both sides agree now makes him totally disabled," entitles Gilchrist to continued total disability benefits. The circuit court later affirmed. Today, in an opinion issued concurrently with this one, we affirm that ruling. *Gilchrist v. Trail King Industries, Inc., (Gilchrist II),* 2000 SD 68, 612 N.W.2d 1.

[¶ 13.] Gilchrist appeals, contending that (a) the court was premature in granting summary judgment to RSI after staying proceedings, including discovery; (b) material issues of fact exist to bar summary judgment; and (c) judgment was improperly certified for appeal under SDCL 15-6-54(b).[5] We review summary judgments under our familiar standard first set out in *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

run a forklift while taking certain pain medication. Also, after Dr. Cho became aware of Gilchrist's internal bleeding, she modified her work release to be contingent on Dr. Christensen's approval.

4. Trail King claims that after Gilchrist was approved for light duty work, his benefits were reduced, but not ended. Temporary partial disability checks were sent to Trail King from Risk Administration and were available for Gilchrist, but he never went to Trail King to pick them up, nor did he inquire about them.

5. We examine a decision to certify under § 54(b) pursuant to the abuse of discretion standard. *Ochs v. Northwestern Nat'l Life Ins. Co.,* 254 N.W.2d 163, 166, 169 (S.D.1977). We find no abuse of discretion.

### Analysis and Decision

#### Summary Judgment Granted During Stay of Discovery

[¶ 14.] Gilchrist contends that the court prematurely granted summary judgment as it had earlier ordered a stay of proceedings, including discovery, pending exhaustion of Gilchrist's administrative remedies. Nonetheless, Gilchrist did not request a continuance or submit an affidavit on his inability to respond to the summary judgment motions. If additional discovery is needed before a matter is ready for summary judgment, the party opposing the motion must by affidavit show that facts essential to justify opposition cannot be presented by affidavit without further discovery. SDCL 15–6–56(f); *Paradigm Hotel Mortg. Fund v. Sioux Falls Hotel Co.*, 511 N.W.2d 567, 569 (S.D.1994); *Brown v. Chaffee*, 612 F.2d 497, 504–05 (10thCir.1979) (necessity of discovery before summary judgment cannot be raised on appeal if no complaint was made in the trial court). Even if a stay of discovery is in place, "[t]he possibility that discovery will yield evidence favorable to a party opposing summary judgment is not a ground to deny summary judgment where the party opposing summary judgment has failed to invoke the procedures under [Rule 56(f) ] to submit affidavits stating a need for discovery or to request a continuance in order to present further affidavits or depositions in opposition to summary judgment." *Larson v. Baer*, 418 N.W.2d 282, 288–89 (N.D.1988). The court did not err in proceeding with the summary judgment motions.

#### Separate Liability of Rehabilitation Consultant

[¶ 15.] The crucial question here is whether RSI, the rehabilitation consultant Trail King hired to assist Gilchrist in returning to work, owed a legal duty to him and, if so, whether it breached that duty. Gilchrist alleges that Trail King and RSI "acted and conspired together to inflict emotional distress," refused to pay for his medical expenses and surgery, discontinued his physical therapy and medicinal needs, and tried to compel him to return to work without appropriate releases from his physicians. At the summary judgment hearing, RSI contended that Trail King made all decisions on benefit payments. As for compelling Gilchrist to work before he was medically able, RSI insisted it did not influence Trail King, and that Dr. Cho and the employer made those decisions. We will examine separately each of Gilchrist's claims against RSI.

#### a. Bad Faith

[¶ 16.] Whether an employer's rehabilitation consultant can be held liable to a workers' compensation claimant for bad faith is a question of first impression in South Dakota. In the insurance context, an insurer's violation of its duty of good faith and fair dealing may give rise to the tort of bad faith. *See Stene v. State Farm Mut. Auto. Ins. Co.*, 1998 SD 95, ¶ 19, 583 N.W.2d 399, 403. In such cases, there must be a failure to comply with a duty under the insurance contract. *Id.*

[¶ 17.] Analogously, to establish bad faith against a workers' compensation rehabilitation consultant there must first be a showing that the rehabilitationist owed a duty to the injured worker. The existence of a duty depends on the nature of the relationship; thus, we must decide if a relationship existed between the parties that imposes on RSI a legal obligation to Gilchrist that may give rise to a tort for its violation. *See Bland v. Davison County*, 507 N.W.2d 80, 81 (S.D.1993) (citations omitted). RSI was retained by Trail King, a self-insured employer, to assist Gilchrist in returning to work. Burns, in her deposition, acknowledged that: "I am a coordinator, a communicator between the insurance company, the injured worker, the employer and the medical providers."

[¶ 18.] The Illinois Supreme Court concluded that the relationship in these cir-

cumstances is primarily between the rehabilitation company and the workers' compensation insurer. *Cole v. Byrd,* 167 Ill.2d 128, 212 Ill.Dec. 234, 656 N.E.2d 1068 (1995). Likewise, in *Campbell v. Eckman–Freeman & Assoc.,* 670 N.E.2d 925, 934 (Ind.Ct.App.1996), an Indiana Appeals Court ruled that the injured worker and the rehabilitationist "did not have a relationship ... which would support a duty in negligence." By factoring policy considerations, the nature of the relationship, and foreseeability, the *Campbell* court reasoned that "no duty should be recognized" under the facts of that case. *Id.* at 935. Recognizing the competing policy concerns, the court wrote:

> The medical rehabilitation coordinator is hired by the insurer with the goals of containing costs and returning the employee to work as expeditiously as possible, but also as safely as possible. On the other hand, the injured worker cannot be considered and treated as a party possessing equal bargaining power. The balancing of these important policy considerations is a task that should be reserved for the legislature. At the very least, companies that render rehabilitation services such as Eckman–Freeman should be required to disclose to the injured employee the limited nature of their obligations and make clear that they are employed by the insurance carrier.

*Id.* Nonetheless, the court also stated that if the worker had been able to establish that the rehabilitation company had caused the worker additional injuries then public policy would dictate that the worker be compensated. We find these authorities persuasive.

■ [¶ 19.] For a workers' compensation claimant to have a separate cause of action against the rehabilitation consultant hired by the employer to assist the claimant in returning to work, the claimant must show that the consultant caused some additional injury to the claimant. *Campbell,* 670

N.E.2d at 935. Gilchrist claims that RSI acted in consort with Trail King to inflict emotional distress, to prematurely return him to work, to terminate his employment, and to end his medical care and coverage. These assertions must be examined separately; otherwise, the duty of an employer to the injured employee and the duty of the rehabilitation consultant to the employer become intermeddled.

[¶ 20.] In *Stump v. Commercial Union,* 601 N.E.2d 327 (Ind.1992), an agent of the workers' compensation carrier promised to provide the claimant, who lost both legs in an industrial accident, certain necessary care and equipment in order to induce him to leave the hospital fourteen days early. *Id.* at 329 n. 1. The agent never supplied the additional services and as a result the claimant suffered additional physical injuries which kept him from being fitted with permanent artificial limbs. The Indiana Supreme Court upheld a cause of action against the carrier for its agent's tortious conduct. *Id.* at 334.

[¶ 21.] In *Vakos v. Travelers Insurance,* 691 N.E.2d 499 (Ind.Ct.App.1998), the court upheld a claim by an injured worker against his employer's workers' compensation carrier because the negligent acts "were committed subsequent to and independent of the original injury." *Id.* at 503. The alleged injuries occurred from the case manager's negligence in directing medical treatment, and not from processing claims on benefits for the underlying injury. *Id.*

[¶ 22.] Lastly, in *Rayford v. Lumbermens Mutual Casualty Co.,* 840 F.Supp. 606 (N.D.Ind.1993), Rayford's psychological disorders arose from and were proximately caused by his work related accident and not by the allegedly tortious acts of the defendants. *Id.* at 611–12. The *Rayford* court recognized that *Stump* only permits injured workers to pursue claims against their employers' carriers if there were "additional injuries or harm proximately caused by [the carriers'] actionable

conduct." *Id.* at 610 (quoting *Stump,* 601 N.E.2d at 331) (emphasis omitted).

[¶ 23.] With these cases to guide us, we ask, what additional injuries does Gilchrist allege occurred as a result of RSI's subsequent and independent acts of bad faith in coordinating care and rehabilitation for his underlying injuries? In his brief Gilchrist states that "Burns hounded Dr. Cho for an inappropriate work release which was then used to terminate [him] from his job while he was still convalescing. This sent him spiraling downward emotionally and psychologically." The Department has now concluded, however, that Gilchrist is totally disabled and entitled to continued total disability payments as a result of his work related depression, resulting from his original injury compounded by the delays in his rotator cuff and wrist surgeries. Thus the very injuries for which Gilchrist claims RSI is responsible were adjudged to be work related and compensable. We conclude, therefore, that under the facts of this case, RSI has not caused additional injuries to Gilchrist such that an action for bad faith can be sustained. We affirm summary judgment on this cause of action.

#### b.  *Wrongful Termination*

[¶ 24.] Gilchrist argues that RSI and Trail King conspired to end his employment. RSI, however, maintains that a wrongful termination claim is proper against an employer only. We must agree, as Gilchrist cites no authority to the contrary. Because Trail King, not RSI, made the decision to fire Gilchrist, RSI cannot be liable for wrongful termination. We therefore affirm summary judgment on this claim.

#### c.  *Intentional Infliction of Emotional Distress*

[¶ 25.] Gilchrist alleges in his complaint that many actions of both RSI and Trail King support his suit for intentional infliction of emotional distress. Most prominent is the claim that RSI sent its "representatives to attend plaintiff's personal physician visits over his objections; and then [discussed] plaintiff's private personal conditions with his doctors in his presence with the obvious intent to [report] the results to others." RSI's representative, Burns, is a nurse.

[¶ 26.] To prove the tort of intentional infliction of emotional distress, the claimant must show that the actor (1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff severe emotional distress, (3) which conduct in fact caused the plaintiff distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the actor's conduct. *Kjerstad v. Ravellette Publications, Inc.,* 517 N.W.2d 419, 428 (S.D.1994). To be outrageous, the conduct must be "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Stene,* 1998 SD 95, ¶ 32, 583 N.W.2d at 404 (quoting *Tibke v. McDougall,* 479 N.W.2d 898, 907 (S.D.1992)). From our review of the record, we see no conduct approaching the outrageous. Summary judgment was proper.

[¶ 27.] Affirmed.

[¶ 28.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.